ELMER J. WOODCOCK v. JOEL C. BOLSTER, Appellant.

*School District. Vacancy. Officer de facto. Qualification of voter and office-holder in towns and school districts. Collection of Taxes.*

The offices of a school district do not become vacant merely by the neglect of the district to maintain a school as required by No. 32 of the acts of 1859, and No. 4 of the acts of 1860, (see General Statutes, chap. 22, sec. 40. Such neglect merely furnishes a reason for vacating the offices, and they do not become vacant until the selectmen have made new appointments.

If a clerk of a school district, who has been irregularly elected, acts as clerk *de facto*, and, as such, regularly calls an annual meeting of the district, the irregularity of his election will not affect the validity of the election of the officers regularly elected at such meeting.

If one be elected sole prudential committee of a school district who is by law ineligible, his assessment of a tax voted by the district will be invalid.

It is not a requisite qualification of a voter or office-holder in a town or school district, that he be a freeman.

The erroneous declaration of a tax-collector at the sale of property distrained for taxes, that he has sold enough property to satisfy the tax and costs, and that he shall sell no more, does not prevent him from legally proceeding, on the same occasion and without any adjournment of the sale, to sell sufficient property to meet the tax and costs.

TRESPASS for taking a waggon, one neck yoke and two straps, one whiffletree, one evener and two clevies. The defendant justified the taking and disposing of the property by virtue of a tax bill and warrant issued to him as collector of school district No. 8, in Winhall. The following facts were agreed upon :

There has been, for some eight or ten years, in Winhall, a legally organized school district, known and designated as district No. 8.

At the time of the assessment of taxes hereinafter mentioned, the plaintiff had a legal grand list of eleven dollars, on which he was liable to pay taxes in such district. The district have acted, and have been recognized as a regular school district, from their organization some ten years since, and have regularly, and from time to time, chosen their officers until March, 1859, when they also elected their officers ; but they held no school meeting,

Woodcock *v.* Bolster.

and made no election of officers for the year 1860, nor were any appointed by the selectmen of the town of Winhall, and during the whole of the school year, commencing April 1st, 1860, the district neglected to cause a common school of any grade to be kept or taught in the district for any period whatever.

In the early part of March, 1861, some doubts were entertained by certain members of the district, whether the district had not lost its organization by its non-compliance with the statute of 1859, and thereupon application was made by certain members of the district to the selectmen of Winhall for re-organization. The selectmen thereupon proceeded to organize it anew, by calling a meeting of the school district on the 12th of March, 1861, when, under the superintendence of one of the selectmen, a board of officers for the district, consisting of a moderator and clerk, were elected, who were the same persons legally elected to the same offices at the last election of officers in the district in March, 1859. The clerk so elected on the 12th of March, 1861, then warned a school meeting of the district, (giving the proper notice,) to assemble in the school house in the district, on the last Tuesday of March, 1861, for the purpose of electing officers of the district for the ensuing year, and, among other things, " to see if the district would vote to build a shed to put school wood in." On the 26th of March, 1861, agreeably to such warning, the district held their school meeting, and elected the defendant collector, and one Patrick Duane, an unnaturalized Irishman, then a resident, and the owner of real and personal estate, in such district, duly assessed to him in the grand list thereof, the sole prudential committee.

Said Patrick Duane was born in Ireland, and resided there until after he was twenty-one years of age, when he migrated to this country, and has never been naturalized.

The defendant as collector, and Patrick Duane as prudential committee, accepted their respective appointments, and on the first of April thereafter entered upon their respective duties.

Pursuant to a vote of the district, passed at the school meeting held on the 26th day of March, 1861, warned as aforesaid,

Patrick Duane, as prudential committee, assessed a tax upon the lists of the inhabitants of the district, and on the lands in the district belonging to persons living out of it, and in such tax there was assessed against the plaintiff, upon his list, the sum of nine dollars and seventy cents, (his proper quota or proportion of such tax) and a rate bill and warrant in due form were issued to the defendant as collector, to levy and collect such taxes. The defendant properly demanded such tax of the plaintiff, who refused to pay the same; whereupon the defendant, as collector, by virtue of such rate bill and warrant, distrained the property above mentioned, and advertised the same for sale, in due form, according to law. On the day of sale the defendant first offered for sale the wagon, and sold the same at public auction to the highest bidder, for the sum of eleven dollars and sixty-two cents, and then said he should not sell any more of the property until he had figured up his costs; and having figured up his costs, he said to the persons and bidders present that he had sold the wagon for a sum sufficient to pay the tax and costs, and should not sell any more.

The plaintiff then caused the writ in this case to be served on the defendant, whereupon the defendant, uttering some revengeful threats, called back the dispersing audience, and sold the remaining articles described in the declaration, at public auction, to the highest bidder, for one dollar and thirty-seven cents. The tax against the plaintiff then amounted to nine dollars and seventy cents. The defendant travelled, in connection with the collection of such tax, fifteen miles, for which he taxed as costs ninety cents. He necessarily employed one man and a yoke of oxen to assist him in moving the property one half mile, for which he taxed fifty cents; for keeping the property to the time of sale he taxed fifty cents, for removing the property to the place of sale he taxed fifty cents, for eight per cent commission he taxed seventy-seven cents, and for levy he taxed twenty-seven cents, amounting in all to three dollars and forty-four cents, which, with the tax, amounted to thirteen dollars and fourteen cents.

The whole of the sales amounted to thirteen dollars and nine-

teen cents, and the plaintiff has never demanded the overplus of five cents of the defendant, or an account of the tax and costs, which costs the defendant now claims.

| | |
|---|---|
| The parties agreed that the wagon was worth | $18.00 |
| The neckyoke and straps, | 1.90 |
| And the evener, whiffletrees and clevies, | 1.34 |

Upon these facts the county court, at the December Term, 1861, KELLOGG, J., presiding, rendered judgment for the defendant, to which the plaintiff excepted.

*H. K. Fowler*, for the plaintiff.

*Butler & Wheeler*, for the defendant.

POLAND, CH. J. The first of the plaintiff's objections to the sufficiency of the defendant's justification is, that the defendant was not legally elected collector.

This rests wholly upon the ground that the meeting of the district, at which he was elected, was notified by a person who was not legally holding the office of clerk of the district. He was elected clerk at the annual meeting of the district in March, 1859, which is conceded to have been a valid election, and was also elected clerk at the meeting of the distrtct on the 12th of March, 1861, called by the selectmen to re-organize the district, and no other person had been elected or appointed to the office in the meantime.

It is claimed that he could not legally be regarded as holding the office under the election of 1859, by reason of the acts passed in 1859 and 1860, and the failure of the district to cause a school to be kept in the district for the period of four months during the school year succeeding April 1, 1860 ; that thereby the district offices became absolutely vacated, and the officers last elected wholly disqualified to act, whether the selectmen appointed others or not. We are of opinion that the language of the acts referred to, does not require so stringent an interpretation, and that the failure of the district to cause a school to be kept as provided, is to be treated as a cause or reason for vacating the offices, but that the officers are not absolutely displaced and ejected

from office, until the proper steps have been taken, and the select-
men have taken action upon the matter, and appointed others.
It might be a matter of dispute, whether there had been a failure
on the part of the district, to cause a school to be kept for the
required period ; there might be a failure of but a single day, and
that might be the result of mistake or accident, so as not to bring
the case within the spirit, though within the letter of the statute,
so that the selectmen might refuse to interfere and make a new
appointment.   Or it might happen, that there had been a failure
to make exact compliance, when all parties supposed there had
been such a compliance, and the district officers had consequently
gone forward in the prosecution of their appropriate official
duties.   If, on subsequent discovery of this failure, all the acts
of the district officers are to be held void, and they liable for all
their official acts as wrong doers, it would lead to great mischief.
This interpretation saves all the beneficial purpose of the statute,
by giving the selectmen the power of removal, by the appoint-
ment of others, and avoids the many evils that might flow from
the adoption of the plaintiff's view, that such failure absolutely
determines the office, so that the officer has no power to act.
And this view of the statute is by no means a novel one.

In many cases where statutes have used the word *void*, it
has been construed to mean *voidable ;* ground or cause for mak-
ing void.

So where statutes use the word, *forfeit*, or *forfeiture*, they
have usually been construed to mean *cause of forfeiture ;* and
some proceeding or action must be had to effect it, before any
actual forfeiture is incurred.   Without reference therefore to the
election of March, 1861, we think the clerk, who called the meet-
ing at which the defendant was elected, held the office, so that
his act in calling the meeting was legal.

There is no claim now made that the district had become dis-
organized so that there was any proper occasion for a new organ-
ization.   But another election at this meeting of the former clerk
to the same office could not prejudice his right to hold it under
the former election.

But if the clerk, who warned the meeting at which the defendant
was elected collector, held the office only in virtue of the election

at the meeting called by the selectmen, we think it would not render the defendant's election invalid. The clerk held and exercised the office by virtue of an election at a meeting of the voters of the district, publicly called, and held the office *de facto*, which, so far as third persons are concerned, is all that is required to make his acts valid. This well settled doctrine, as to the validity of the official acts of persons acting under color of office, where some irregularity has occurred in his appointment, or election, or induction into office, where others are concerned, is especially important as applied to school districts, whose proceedings are usually conducted by men little versed in legal learning, and often by men of small attainments in any branch of education or business.

Suppose, at a school district meeting for the choice of officers, the notice lacks one day of the number required by statute. The election is so far invalid that none of the officers could justify in a suit brought against himself for any official act.

But if the clerk elected at such meeting calls the next annual meeting of the district, at which officers are elected, are those elections invalid, on account of the irregularity in his election? If so, the same consequence would attend the next election, and the district thus become effectually disorganized.

The plaintiff's second objection to the defence set up is, that the tax which the defendant had to collect, was illegally assessed, because the committee who assessed it, and who was elected by the district, was an unnaturalized foreigner, who, as he claims, could not vote in the meetings of the district, and was not eligible to any office in the district. It has been suggested by the defendant's counsel, that if such person was not legally eligible to the office, still he might be an officer *de facto*, whose official acts would bind third persons. But this doctrine, we think, could not be extended to cover a case where by law the person could not hold the office, and if such foreigner was not by law eligible to the office of committee, his acts cannot be regarded as valid, any more than those of a woman or minor who should be elected to the same office.

The question presented is certainly one of very considerable practical importance, as it is conceded that the right to hold

office in the district, and the right to vote in school meeting, depend alike on the answer, and still further that the right of voting in town meetings, and of holding a town office, are subject to precisely the same objection and to the same extent.

The provision of the statute in relation to voters in school districts, is as follows : " And any man of the age of twenty-one years, who, at the time, shall reside, and be liable to pay taxes in such district, shall be a legal voter in the same" ; sec. 23, chap. 20, Com. Stat. p. 146.

The right to vote in town meetings is thus defined in the statute : " Every male person of the age of twenty-one years, whose list shall have been taken in any town the year preceding his voting, and all persons exempt from taxation in consequence of having arrived at the age of sixty years, shall, during their residence in such town, be legal voters in town meeting" ; sec. 1, chap. 15, Comp. Stat. 112.

It will be found by examining the earlier statutes of the state, that these provisions in relation to the right of voting in town and school district meetings have been substantially the same as now, from the beginning almost of our state legislation.

Notwithstanding the very plain terms used by the statutes to define the qualifications of voters in town and school district meetings, the plaintiff insists that none but *freemen*, who are entitled to vote for representatives to the legislature, and for county and state officers, are really entitled to vote at such meetings. The argument is that the qualification required by the statute is synonymous with that of the old constitution as to freemen, and that when the amendment to the constitution was adopted in 1828, which excluded aliens from becoming freemen of this state, until they had been duly naturalized according to the laws of the United States, it worked the same change in the qualification of voters in town and school meetings.

But the very starting point assumed in this argument is untrue. The old constitution provided that " every man of the age of twenty-one years, having resided in the state for the space of one whole year next before the election of representatives, and is of a quiet and peaceable behavior, and will take the following oath or affirmation, shall be entitled to all the privileges of a freeman

Woodcock *v.* Bolster.

of this state." Under this provision of the constitution an alien might become a freeman of this state, and entitled to vote for representatives to the legislature and for state officers, without being naturalized according to the acts of Congress, by residing one year in the state and taking the freeman's oath. But this requirement was by no means synonymous with that of a voter in town or school meeting. A man could be a freeman without being a tax payer, but must have resided in the state a year, while no man could vote in town or district meetings without being a tax payer, but might, though his residence in the state had been less than a year. But even if there had been the agreement between the requirement of the old constitution as to the qualification to become a freeman, and that of the statutes defining the qualifications of voters in town or school meetings which the plaintiff claims, we fail to see how it would follow that a change of the constitution in relation to the qualifications of freemen should work a corresponding change in the statutes regulating voting in town and school meetings; and more especially, when the same statutes have several times been re-enacted in substantially the same language, since the amendment of the constitution, and all the while, we believe, under a practical construction entirely different from what the plaintiff claims. It has not been questioned but that it is actually within the power of the legislature to regulate the right of voting in such meetings, and the right of holding office, according to their pleasure, and that there is nothing in the constitution restraining its exercise. An instance of the exercise of such power by the legislature is shown in the requirement of the statute, that all the more important of the town officers shall be freeholders, which continued from a very early day down to within a few years.

Yet it was never required that a man should be a freeholder to be a freeman, or to be eligible to any office provided for in the constitution. The provisions in our election laws that the constable of the town shall be the presiding and certifying officer of freemen's meetings, and that the selectmen of the town shall form a part of the board of civil authority to determine the qualification of voters, are relied upon as showing the understanding of the legislature that these officers shall themselves be free-

men. These were adopted at an early day under the old constitution, when so short a period of residence was required in order to entitle any man to become a freeman, and the number of aliens in the state was so few, that but little probability existed that any but a freeman could be elected to such office, and as no practical difficulty was experienced, they have been continued to the present time. Although it seems incongruous that any but freemen should be allowed to act as officers in freemen's meeting, still there is nothing legally incompatible with it, and we cannot regard these provisions as sufficient to override the direct and positive language of the statutes as to who may vote and hold office in towns and school districts. It is also urged, that, upon general principles of public policy, unnaturalized foreigners should not be allowed this limited right to vote and hold office ; that with so little education as they usually have, and such limited knowledge of the principles and policy of our government as they possess, there is danger in allowing them to exercise even so small a share in the government and management of our educational and municipal institutions. If we were satisfied with the soundness of this objection, it could have but little influence on our decision, as our duty is limited simply to the determination of what the legislature have enacted, and we have little to do with the reasons or policy by which they were actuated. But we are not satisfied that the objection itself is sound.

By the liberal principles adopted by our government, foreigners, who come to reside among us, after five years' residence, and after complying with the laws of Congress in relation to naturalization, become equally entitled with native born citizens to participate in all the affairs of the government, both in making and administering the laws. It has been the policy of our government to encourage emigration from abroad, and, at as early a period as may be, to extend to such emigrants all the rights of citizenship, that their feelings and interests may become identified with the government and the country. While awaiting the time when they are to become entitled to the full rights of citizenship, it seems to us a wise policy in the Legislature to allow them to participate in the affairs of these minor municipal corporations,

as in some degree a preparatory fitting and training for the exercise of the more important and extensive rights and duties of citizens. It is of the greatest importance that the children of such persons should be educated, at least to the extent for which opportunity is afforded by our common schools, and that the parents should be induced to send their children to school, and it seems to us that they would be much more likely to do so, and to take interest in their attendance and improvement, if allowed to participate in their regulation and management, than if wholly excluded. We cannot see the threatened danger to our institutions from the allowance of this right, while they are excluded from all influence and participation in the law-making power of the government, or in the general elections, or the general public administration of the laws of the country. So far as we have had personal knowledge of the practical construction of these statutes, it has been entirely in accord with the view we have taken, and if we have mistaken the intent of the Legislature, we have the satisfaction of knowing that it can be easily and speedily corrected.

The remaining objection is to the regularity of the defendant's proceedings in the sale of the plaintiff's property.

If the defendant had so far suspended the proceedings of the sale, as really to make the sale at a different time from that given by his notice of the sale, such after sale would doubtless be illegal. But there appears to have been no adjournment of the sale, and no great delay in the time, and the mere declaration of the defendant that he should sell no more, was of no importance. If he had not sold enough to pay the tax and cost, he had the right to sell sufficient, and if the law gave him the right to do so, his motive was of no importance.

Judgment affirmed.