Dennis P. **GLICK**, Petitioner and Appellee,

v.

M. Tamara **HOLDEN**, Warden, Respondent and Appellant.

No. 940004–CA.

Court of Appeals of Utah.

Feb. 9, 1995.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆

James H. Beadles, Asst. Atty. Gen. and Jan Graham, State Atty. Gen., Salt Lake City, for appellant.

Alan R. Andersen and Bentley J. Tolk, Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City, for appellee.

Before BILLINGS, DAVIS and JACKSON, JJ.

## OPINION

JACKSON, Judge:

M. Tamara Holden, warden at the Utah State Prison, appeals the trial court's grant of Dennis P. Glick's petition for extraordinary writ, requiring the Utah State Prison to apply Arkansas policy and procedures to Glick pursuant to the Interstate Corrections Compact. We reverse.

## FACTS

Upon his request, Glick, serving a prison sentence imposed by the state of Arkansas, was transferred to the custody of the Utah State Prison pursuant to the Interstate Corrections Compact (ICC) on October 21, 1991.[1] The ICC was adopted in Utah in 1959 to "improve the range of institutional facilities, confinement, treatment, and rehabilitation programs available for offenders incarcerated by its member states." *Gibson v. Morris,* 646 P.2d 733, 734 (Utah 1982); *see* Utah Code Ann. § 77–28a–1 to –5 (1990). An inmate may request a transfer to take advantage of programs offered in other states or to be closer to family members. Utah has also entered into a separate contract with Arkansas for implementation of the ICC. *See* Utah Code Ann. § 77–28a–1, Art. III (1990) (terms

of ICC shall be part of any contract entered into between states and nothing in contract shall be inconsistent with ICC).

Upon arrival at the Utah State Prison, Glick was classified at a higher security classification than he had been in Arkansas.[2] Additionally, in Utah, Glick is only allowed one female visitor other than those in his immediate family, while Arkansas allowed him several unrelated female visitors. In Arkansas, Glick was allowed to grow a mustache and style his hair as he pleased. Utah's prison policies prevent inmates from growing a beard, mustache, or long hair, except in cases of medical necessity. Further, while in Utah's custody, Glick was disciplined by prison authorities for an incident involving damage to state property. Glick asserts that the disciplinary hearing held in Utah should have been conducted pursuant to Arkansas rules and policies.

On March 31, 1992, Glick filed a petition for writ of mandamus in state court, based on his disciplinary treatment and the enforcement of Utah's classification, grooming, and visitation policies. On July 6, 1992, the trial court dismissed the action because of Glick's failure to attach documents required by Rule 65B(b) of the Utah Rules of Civil Procedure. A few months later, based upon Glick's motion for a new trial, the court vacated the order of dismissal, ordered Holden to file an answer, and appointed pro bono counsel for Glick.

On January 22, 1993, Glick brought a 42 U.S.C. § 1983 action in federal district court, also challenging the application of Utah rather than Arkansas policies. On March 30, 1993, a magistrate judge issued a report and recommendation, dismissing the claims relevant to this appeal as frivolous, pursuant to 28 U.S.C. § 1915(d). Glick received the report and recommendation but never objected to it. On May 19, 1993, the federal district judge approved the report and recommenda-

---

1. Pursuant to Utah Code Ann. § 77–28a–1, Art. XI (1990), "[a]n inmate must request a transfer in writing before such a transfer can be made."

2. Glick was incarcerated in Arkansas after being found guilty of six counts of rape. He escaped twice while in custody in Arkansas.

tion and dismissed several counts in Glick's complaint, concluding that the ICC did not obligate Utah's prison system to apply Arkansas policies and procedures.

On August 30, 1993, Holden answered the state petition and on September 10, 1993, filed a motion for summary judgment, contending the ICC did not require Utah to apply Arkansas policies and procedures to Glick while he was incarcerated in Utah. In response, Glick also filed a motion for summary judgment on September 22, 1993, alleging that the ICC affirmatively required Utah to follow Arkansas prison regulations. After a hearing on the motions, the trial court granted Glick's motion for summary judgment.[3] Within a few days of the trial court's oral decision, Holden's attorney learned of Glick's section 1983 complaint in federal court. Holden's attorney then filed a motion to vacate the judgment pursuant to Rule 60(b) of the Utah Rules of Civil Procedure, claiming that res judicata barred Glick's state claim, and that the trial court should set aside its grant of the motion for summary judgment. The trial court denied the motion to vacate on November 22, 1993, signed Glick's proposed order, and granted a motion by Holden to stay execution of the order pending appeal.

## ISSUES

This case raises the following issues for review: (1) whether the order of the United States District Court, dismissing the same issues raised in this case, requires dismissal based on collateral estoppel;[4] and (2) whether the ICC requires that the Utah State Prison apply Arkansas disciplinary, classification, visitation, and grooming policies to Glick.

**3.** The trial court concluded that under the ICC, Utah acted merely as an agent for Arkansas, and therefore, Utah had to apply Arkansas visitation, grooming, and classification policies. Additionally, the trial court ruled that Utah must either: (1) reconvene the disciplinary proceedings to which Glick had been subjected while at the prison and hold them according to Arkansas rules; (2) send the evidence used in the disciplinary proceedings to Arkansas officials for a deci-

## ANALYSIS

### Collateral Estoppel

■ Holden asserts Glick's claims made to the trial court are barred by the doctrine of collateral estoppel, based upon the federal district court's prior decision. Application of collateral estoppel is appropriate when: (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted is a party or is in privity with a party to the prior adjudication; and (4) the issue in the first case was completely, fully, and fairly litigated. *Mackintosh v. Hampshire,* 832 P.2d 1298, 1301 (Utah App.), *cert. denied,* 843 P.2d 1042 (Utah 1992); *Berry v. Berry,* 738 P.2d 246, 248 (Utah App.1987).

■ Glick first challenges Holden's collateral estoppel defense by alleging that Holden waived the defense by not raising it in pleadings before the trial court. However, we conclude that Holden did not waive the defense because the state was not apprised of the federal court proceeding and the trial court completely addressed the issue in a post-trial motion for reconsideration. *See State v. Seale,* 853 P.2d 862, 870 (Utah) (finding that if trial court addresses issue in post-trial motion rather than finding it waived, right to assert issue on appeal is resuscitated), *cert. denied,* —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993).

Glick next claims that the federal case was not dismissed on the merits. Glick filed his federal claim *in forma pauperis,* which allows the federal court to review whether the claim is frivolous under 28 U.S.C. § 1915(d). A complaint " 'containing as it does both factual allegations and legal conclusions, is

sion; or (3) record or transcribe the disciplinary hearing and send it to Arkansas officials for their concurrence in the result.

**4.** The parties both fashioned this argument as a res judicata claim in their briefs. However, at oral argument, both conceded that the claim was really one of collateral estoppel.

frivolous where it lacks an arguable basis either in law or in fact.'" *Denton v. Hernandez,* — U.S. —, —, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992) (quoting *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1831–32 (1989)). The United States Supreme Court held that a section 1915(d) dismissal is "not a dismissal on the merits, but rather an exercise of the court's discretion under the *in forma pauperis* statute." *Denton,* — U.S. at —, 112 S.Ct. at 1734. Thus, the Court determined that a section 1915(d) dismissal does not prejudice the "filing of a paid complaint making the same allegations." *Id.* However, the action in *Denton* was found to be *factually* frivolous, "that is without an arguable basis in fact." *Slangal v. Getzin,* 148 F.R.D. 691, 697 n. 10 (D.Neb.1993); *see Denton* 112 S.Ct. at 1733. Thus, *"Denton* left open the question of whether a dismissal pursuant to § 1915(d) for lack of an arguable basis in law, would also be made without prejudice." *Slangal,* 148 F.R.D. at 697 n. 10 (citation omitted).

Although the order signed by the federal district judge does not specifically state whether the dismissal pursuant to section 1915(d) was because Glick's claims lacked an arguable basis in fact or lacked an arguable basis in law, it appears that the order dismissed the claims because they were legally insufficient.

Thus, it is unclear based on current case law whether a dismissal for lack of an arguable basis in law, which is what likely occurred in Glick's federal case, is on the merits. However, because we conclude that Utah need not apply Arkansas policies and procedures, as discussed below, we will not attempt to address whether the United States

Supreme Court intended dismissals based on lack of an arguable basis in law to be considered "on the merits."

## Arkansas Versus Utah Policies and Procedures

■ Glick claims the ICC and the contract between Utah and Arkansas to implement the ICC require the Utah State Prison to apply Arkansas's disciplinary, classification, visitation, and grooming policies to Glick. Whether the Arkansas policies should apply to Glick depends upon the interpretation of the governing contract and statute containing the ICC. The trial court's interpretation of the statute and contract presents a question of law. *Ward v. Richfield City,* 798 P.2d 757, 759 (Utah 1990) (statute); *Equitable Life & Casualty Ins. Co. v. Ross,* 849 P.2d 1187, 1192 (Utah App.1993) (contract), *cert. denied,* 860 P.2d 943 (Utah 1993). Thus, we accord its interpretation no particular deference but review it for correctness. *Salt Lake City v. Emerson,* 861 P.2d 443, 445 (Utah App.1993) (statute); *Equitable Life,* 849 P.2d at 1192 (contract).

Our Iowa counterpart has already decided similar ICC issues presented by the facts of this case in *Cranford v. Iowa,* 471 N.W.2d 904 (Iowa Ct.App.1991). Additionally, two federal courts have addressed some of the identical issues raised by Glick in *Stewart v. McManus,* 924 F.2d 138 (8th Cir.1991) and *Jaben v. Moore,* 788 F.Supp. 500 (D.Kan. 1992).[5]

■ Glick relies on various provisions of the ICC and implementing contract between Arkansas and Utah to support his claim that

---

**5.** Glick argues that we should not rely on cases from other jurisdictions because the Utah Supreme Court case of *Gibson v. Morris,* 646 P.2d 733 (Utah 1982), requires that Arkansas polices should apply to Glick. In *Gibson,* the court determined that Utah, acting as an agent for the sending state, had no authority to transfer an ICC inmate to another state without the sending state's permission. *Id.* at 736. It does not stand for the proposition that the disciplinary, visitation, classification, and grooming policies of the sending state must apply.

While in *Stewart* and *Jaben,* the inmates brought their actions pursuant to 42 U.S.C. § 1983, the inmate in *Cranford* brought a state action, claiming that the failure to apply the receiving state's law violated the ICC. *Cranford,* 471 N.W.2d at 905. Further, although the federal cases were fashioned as § 1983 complaints, the complaints alleged the application of the receiving state's policies and procedures violated the ICC, which is identical to the claims made by Glick.

Arkansas policies should apply to him. He first cites Utah Code Ann. § 77–28a–1, Art. IV(f) (1990):

> Any hearing or hearings to which an inmate confined pursuant to this Compact may be entitled by the laws of the sending state may be had before the appropriate authorities of the sending state, or of the receiving state, if authorized by the sending state. . . . In the event such hearing or hearings are had before officials of the receiving state, the governing law shall be that of the sending state. . . . In any and all proceedings had pursuant to the provisions of this subdivision, the officials of the receiving state shall act solely as agents of the sending state and no final determination shall be made in any matter except by the appropriate officials of the sending states.

Glick also points to a provision in the ICC providing that he should not be deprived "of any legal rights which [he] would have had if confined in . . . the sending state." *Id.* at Art. IV(e). He then refers to the implementing contract, which states that "[e]xcept where expressly otherwise provided, the laws and administrative regulations and rules of the sending state shall govern in any manner relating to an inmate confined pursuant to this contract and the Interstate Corrections Compact."

We conclude that the ICC and contract do not mandate that Arkansas policies and procedures be applied to Glick. The ICC provides:

> All inmates who may be confined in an institution pursuant to the provisions of this Compact shall be treated in a reasonable and humane manner and shall be *treated equally* with such similar inmates of the receiving state as may be confined in the same institution.

Utah Code Ann. § 77–28a–1, Art. IV(e) (1990) (emphasis added). The implementing contract bolsters this idea, requiring that *all* inmates be "treated equitably." The contract also provides that "[i]t shall be the responsibility of the . . . receiving state to

. . . maintain proper discipline and control; to make certain that [ICC inmates] receive no special privileges." The contract states that "[t]he receiving state, as agent for the sending state, shall have physical control over and power to exercise disciplinary authority over all inmates from sending states." Finally, the contract states that transferred inmates "shall be subject to all provisions of law and regulations applicable to persons committed for violations of law of the receiving state *not inconsistent with the sentence imposed.*"

As stated in *Cranford* and *Stewart,*

> [a]lthough the Compact provides that the sending state has a right to conduct hearings in the receiving state and apply its law in situations when the inmate may be entitled to hearings by the law of its state, the Compact and the contract provide that inmates are to be "treated equally," and that *disciplinary* authority shall be exercised by the *receiving* state. . . . We are satisfied that neither the statutory nor contractual provisions mandate that [the sending state's] disciplinary rules and regulations be applied to [the inmate's] disciplinary proceedings in the [receiving state] penitentiary.

*Cranford,* 471 N.W.2d at 905–06 (quoting *Stewart,* 924 F.2d at 141).

Stressing the requirement that all inmates be treated equally, these courts determined that the ICC and implementing contracts do not require that the sending state's policies and procedures be applied to ICC inmates. *Stewart,* 924 F.2d at 141; *Cranford,* 471 N.W.2d at 905; *see Jaben,* 788 F.Supp. at 503 (ICC does not require application of sending state's policies and procedures). A common sense reading of these provisions must allow authorities having daily, physical custody of a transferred inmate to determine the discipline, visitation, classification, and grooming aspects of that inmate's incarceration. *See Jaben,* 788 F.Supp. at 504.

█   Further, to the extent Glick might assert that Arkansas policies regarding disci-

pline, classification, grooming, and visitation create legal rights, Arkansas laws belie the creation of any such legal rights. Arkansas statutes and prison regulations provide no right to a hearing by Arkansas officials for violations of Utah disciplinary rules. Arkansas law does not protect an inmate's right to a particular classification. *Strickland v. Dyer,* 628 F.Supp. 180, 181 (E.D.Ark.1986). Nor does Arkansas law give Glick a legal right to receive several female visitors unrelated to him or to grow a mustache. Accordingly, we conclude that the ICC does not require Utah to apply Arkansas prison policies to Glick while he is incarcerated in Utah.[6]

BILLINGS and DAVIS, JJ., concur.

---

6. The following policy concerns also mandate the conclusion that Utah should not be required to apply each sending state's policies and procedures under the ICC. The purpose of the ICC is to develop and execute "programs of co-operation for the confinement, treatment and rehabilitation of offenders with the most economical use of human and material resources." Utah Code Ann. § 77–28a–1 (1990). To achieve this purpose, the ICC must facilitate inmate transfers, not create obstacles to them. Requiring Utah to learn and apply policies and procedures of every state from which Utah has received an inmate under the ICC would create administrative burdens that would likely lessen Utah's desire to accept inmates from other states. This would create obstacles to interstate transfer, thus thwarting the ICC's purpose.

Further, it would be impractical to allow sending states to set the security classification for prisoners housed in Utah. The sending state's facilities and confinement capabilities would not be identical to Utah's. If a prisoner escaped, it would be Utah citizens at risk, not the sending state's citizens. Further, the contract between Utah and Arkansas also provides that if an ICC inmate escapes, Utah has primary responsibility for retaking the inmate and paying for all associated costs. Thus, Utah should determine the security classification of all inmates housed in Utah.