# Kathleen Daye, Barry Kade, Fredd Lee, Nicholas Bania, Darla Lawton and Vermont CURE v. State of Vermont and John Gorczyk, Commissioner, Department of Corrections

[769 A.2d 630]

No. 99-133

Present: Dooley, Morse, Johnson and Skoglund, JJ., and Suntag, D.J., Specially Assigned

Opinion Filed December 29, 2000

476

*James A. Dumont* of *Keiner & Dumont PC*, Middlebury, for Plaintiffs-Appellants.

*Marie J. Salem*, Assistant Attorney General, Waterbury, for Defendants-Appellees.

*Robert Appel*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Amicus Curiae Office of Defender General.

**Johnson, J.** Plaintiffs Vermont CURE and four of its members appeal from a superior court judgment dismissing their complaint against defendants the State of Vermont and John Gorczyk, Commissioner of the Vermont Department of Corrections. Plaintiffs contend: (1) the transfer of Vermont inmates to out-of-state correctional facilities violates the Interstate Corrections Compact, 28 V.S.A. §§ 1601-1621, and exceeds the Commissioner's statutory authority; (2) the transfer of Vermont inmates to out-of-state facilities violates Chapter II, § 64 of the Vermont Constitution; and (3) the court erred in concluding that plaintiffs lacked standing to assert the statutory and constitutional claims. We affirm.

Plaintiffs are members of Vermont CURE, an organization whose self-described mission is to meet with and advocate on behalf of Vermont prison inmates. They claim to have close personal, religious, or mentoring relationships with one or more inmates, and to have organized and attended numerous meetings with inmates within Vermont correctional facilities. In July 1998, plaintiffs instituted this action against defendants, alleging that the Commissioner had entered into contracts with Monmouth County, New Jersey and the State of Virginia for the transfer of Vermont inmates in contravention of the Interstate Corrections Compact and provisions of the Vermont and United States Constitutions.

Specifically, plaintiffs alleged as follows: that the Commissioner was not authorized to enter into the contract with Monmouth County because the Interstate Corrections Compact (Compact) authorizes

agreements for the transfer of prisoners only with member "states"; that the contract with Virginia violated the Compact by delegating to Virginia officials the authority to determine inmate assignments; that the out-of-state transfers, and the visitation policies of Virginia and Monmouth County, prevented plaintiffs from conducting group meetings with Vermont inmates, in violation of the Compact, as well as plaintiffs' constitutional rights of free speech, association, and assembly; and, finally, that the transfer of Vermont inmates to out-of-state correctional facilities violated Chapter II, § 64 of the Vermont Constitution, which calls for "visible punishments" of persons convicted of crimes.

The State moved to dismiss the complaint, arguing that the out-of-state transfer policy and implementing contracts fully complied with statutory and constitutional law, and further that plaintiffs lacked standing to assert the claims. The trial court granted the motion, ruling that plaintiffs lacked standing to assert the violations of the Compact and the Vermont Constitution, and that neither the transfers per se, nor the visitation policies of the out-of-state facilities, violated plaintiffs' constitutional rights of speech, assembly, or association. This appeal followed.

Plaintiffs contend on appeal: (1) that the court erred in concluding they lacked standing, and (2) that the out-of-state transfers violated both the Compact and the Vermont Constitution.[1] On the standing issue, plaintiffs assert that they fall within the "zone of interests" protected by the Compact. *Allen v. Wright*, 468 U.S. 737, 751 (1984). They cite, in particular, a section of the Compact providing that "[t]he parent, guardian, trustee, or other person or persons entitled under the laws of the sending state to act for, advise, or otherwise function with respect to any inmate shall not be deprived of or restricted in his exercise of any power in respect of any inmate confined pursuant to the terms of this compact." 28 V.S.A. § 1604(i). As individuals with close personal, familial, and mentoring relationships with Vermont inmates, and as an organization that meets with and advocates on behalf of Vermont inmates within Vermont correctional facilities, plaintiffs argue that they fall within the protection of this provision, and that their ability to act on behalf of Vermont inmates has been compromised by the out-of-state transfers. Plaintiffs also argue that

---

[1] Plaintiffs have not renewed their claim on appeal that the transfers and restrictive visitation policy violated their constitutional right to free speech, assembly, and association.

Chapter II, § 64 of the Vermont Constitution grants them, as members of the public, a direct stake in witnessing the "visible punishments" of Vermont convicts.

Recently, in *Hinesburg Sand & Gravel Co. v. State*, 166 Vt. 337, 341, 693 A.2d 1045, 1048 (1997), we explored in some detail the "constitutional" and "prudential" components of the standing doctrine. The issue, we emphasized, cannot be addressed without reference to "'the specific common-law, statutory or constitutional claims that a party presents.'" *Id.* (quoting *International Primate Protection League v. Adminstrators of Tulane Ed. Fund*, 500 U.S. 72, 77 (1991)). We examined, accordingly, the substance of the plaintiff's constitutional and civil rights claims, concluding that they implicated no legally protected right under the Constitution. We affirmed, therefore, the trial court's dismissal both on lack of standing and on the merits. See *id.* at 344, 693 A.2d at 1050 ("Although we affirm the dismissal based on lack of standing, we add that we do not believe the claim has merit under the Equal Protection Clause.").

Here, similarly, we find that the sufficiency of plaintiffs' legal interest under the Compact and Chapter II, § 64 of the Vermont Constitution cannot be evaluated without closely examining the substance of the claims. As explained below, we conclude that even if plaintiffs had standing to assert the statutory and constitutional claims, they would fail on the merits. See *id.* at 340, 693 A.2d at 1047 (holding that "even if plaintiff had standing to bring this action, it has failed to state a cause of action under 42 U.S.C. § 1983").

I.

■ Plaintiffs contend that the contracts with Virginia and Monmouth County, New Jersey violated the Compact and other state laws in several respects. First they argue that the Compact, which authorizes contracts only with "party states," 28 V.S.A. § 1603, circumscribes the Commissioner's authority to transfer prisoners out of state and, therefore, that the agreement with the County of Monmouth, a political subdivision of the State of New Jersey, exceeded the Commissioner's statutory powers. As an administrative body, the Department "has only such powers as are expressly conferred upon it by the Legislature, together with such incidental powers expressly granted or necessarily implied as are necessary to the full exercise of those granted." *Trybulski v. Bellows Falls Hydro-Elec. Corp.*, 112 Vt. 1, 7, 20 A.2d 117, 120 (1941); accord *Perry v. Medical Practice Bd.*, 169 Vt. 399, 403, 737 A.2d 900, 903 (1999). In

operating the State's prison system, the Commissioner's fundamental responsibility is "[t]o maintain security, safety and order at the correctional facilities." 28 V.S.A. § 102(c)(6); see also *State v. Berard*, 154 Vt. 306, 311, 576 A.2d 118, 121 (1990) ("The interest of the state in the safe and orderly operation of Vermont's prisons is great . . . .").

When assigning prisoners to correctional facilities, the Commissioner is broadly authorized "to designate the place of confinement where the sentence shall be served." 28 V.S.A. § 701(b). To this end, the Commissioner may also "order the assignment and transfer of persons committed to the custody of the commissioner." *Id.* § 102(b)(5). Moreover, the Legislature has expressly provided that the Commissioner may "exercise all powers and perform all duties necessary and proper in carrying out his responsibilities and in fulfilling the purposes and objective of this title." *Id.* § 102(c)(17).

The Commissioner's decision to contract with Monmouth County for the transfer of Vermont prisoners was made in response to increasing pressure upon in-state facilities caused by overcrowding. The deleterious effect of overcrowding in jails is widely recognized, and, indeed, has been a continual source of prison litigation. See, e.g., *Alberti v. Klevenhagen*, 46 F.3d 1347, 1353 (5th Cir. 1995) (upholding court-ordered remedial plan to alleviate overcrowding in jails based upon findings concerning its detrimental effect on inmate and staff security, food service, and fire safety); *Alexander v. Boyd*, 876 F. Supp. 773, 791 (D.S.C. 1995) (finding that overcrowded conditions in correctional facilities had negative impact on program effectiveness, security, and other conditions of confinement).

We conclude, therefore, that the authority to enter into the Monmouth County contract was well within the powers reasonably and necessarily implied by the Commissioner's fundamental obligation to maintain prison safety and order, and the Commissioner's express and unfettered statutory authority to designate, assign and transfer inmates. See *Perry*, 169 Vt. at 405, 737 A.2d at 903-04 (medical board's discretion to deny request for withdrawal of application "falls well within the necessary and implied powers of its express statutory mandate") .

■ Plaintiffs maintain, nevertheless, that the Compact itself demonstrates otherwise. They argue that if the authority to transfer prisoners out of state were implicit in the Commissioner's other statutory powers, the Compact would simply not have been necessary. The argument presumes that the Compact was enacted for the

purpose of authorizing such transfers. On the contrary, the Compact expressly acknowledges the validity of *pre-existing* interstate corrections agreements, stating that "[n]othing contained in this compact shall be construed to abrogate or impair any agreement or other arrangement which a party state may have with a nonparty state for the confinement, rehabilitation or treatment of inmates." 28 V.S.A. § 1609; see also *Slater v. McKinna*, 997 P.2d 1196, 1198-99 (Colo. 2000) (holding that Interstate Corrections Compact did not affect or preempt laws of party states providing for transfer of prisoners to private correctional facilities in other states).

▪ The Compact was enacted, not to validate interstate agreements, but to "provide for the mutual development and execution of . . . programs of cooperation for the confinement, treatment and rehabilitation of offenders with the most economical use of human and material resources." 28 V.S.A. § 1601. Its purpose was to establish orderly procedures for interstate transfers, to ensure that prisoners transferred to other states "shall be treated in a reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state," *id.* § 1604(e), and to secure adequate procedural protections for such inmates. See *id.* § 1604(f) (receiving state shall provide adequate facilities for any hearings to which inmate may be entitled under laws of sending state); see also *Ghana v. Pearce*, 159 F.3d 1206, 1207 (9th Cir. 1998) ("The Compact sets forth procedures governing the interstate transfer of state prisoners, and it ensures that such prisoners maintain certain rights provided by the sending state."). Thus, there is no merit to plaintiffs' claim that the Monmouth County contract was invalid as an ultra vires exercise of the Commissioner's authority.

▪ Plaintiffs also contend that the contract with Virginia violated the Compact by delegating to Virginia authorities the right to designate the prison assignment of transferred inmates. Under the Compact, when prison officials of a party state determine that transfer of an inmate to another party state is necessary or desirable, "said officials may direct that the confinement be within an institution within the territory of said other party state, the receiving state to act in that regard solely as agent for the sending state." 28 V.S.A.§ 1604(a). Inmates so transferred remain "subject to the jurisdiction of the sending state," which may at any time remove the prisoner for transfer to an institution within the sending state or to another institution with which the sending state may have a contractual right to confine inmates. *Id.* § 1604(c).

Thus, as the court in *Gibson v. Morris*, 646 P.2d 733, 735 (Utah 1982), observed, "the officials of a receiving state have no authority to make any change in the custody of a prisoner received under the Compact without the direction or approval of the sending state." While Virginia could not, therefore, reassign or transfer a Vermont inmate without the approval of Vermont authorities, nothing in the Compact limited Vermont's power to authorize Virginia to assign Vermont inmates to such Virginia correctional facilities as it deemed to be necessary or proper for security, rehabilitation, or other purposes. Indeed, the Compact expressly contemplates that the party states will enter into contracts addressing, among other subjects, payment, duration, participation in programs of inmate employment, and "[s]uch other matters as may be necessary and appropriate to fix the obligations, responsibilities and rights of the sending and receiving states." 28 V.S.A. § 1603(a)(5). Accordingly, we perceive no infirmity in the contract authorizing Virginia to designate the correctional facility for transferred inmates.

Plaintiffs next contend that the out-of-state facilities' policy of limiting inmates to one adult visitor at a time violates the Compact's requirement that "persons entitled under the laws of the sending state to act for, advise, or otherwise function with respect to any inmate shall not be deprived of or restricted in his exercise of any power in respect of any inmate confined pursuant to the terms of this compact." *Id.* § 1604(i). Plaintiffs contend that the limited visitation policy prevents them from holding the group meetings that they are entitled to hold, and often do hold, in Vermont prisons. Plaintiffs also cite the Compact provision that "confinement in a receiving state shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state." *Id.* § 1604(e).

Contrary to plaintiffs' contention, other states construing identical provisions have concluded that transferred inmates are subject to the disciplinary authority and rules of the receiving state. Indeed, the Compact mandates that transferred inmates "be treated *equally* with such similar inmates of the *receiving* state as may be confined in the same institution." *Id.* § 1604(e) (emphasis added). Thus, courts have uniformly rejected claims that transferred prisoners are entitled to the same disciplinary, classification, visitation, and grooming policies as prisoners in the sending state. See, e.g., *Stewart v. McManus*, 924 F.2d 138, 141 (8th Cir. 1991) ("We do not read the Interstate Corrections Compact or the implementing contract to require the

application of Kansas disciplinary rules and regulations to a transferred prisoner."); *Jaben v. Moore,* 788 F. Supp. 500, 503-04 (D. Kan. 1992) (rejecting claim that Interstate Corrections Compact required application of sending state's custody-classification guidelines); *Cranford v. State,* 471 N.W.2d 904, 905 (Iowa Ct. App. 1991) (holding that Compact did not require application of sending state's disciplinary rules); *Glick v. Holden,* 889 P.2d 1389, 1393 (Utah Ct. App. 1995) (denying prisoner's claim that he was entitled to benefit of policies and procedures of sending state).

Plaintiffs' contention here is similar to that brought by the petitioner in *Glick,* an Arkansas prisoner transferred under that state's Compact to the Utah State Prison. Glick claimed that Utah authorities had violated the Compact by assigning him a higher security classification than he had received in Arkansas, by allowing him only one female visitor other than those in his immediate family, while Arkansas allowed him several unrelated female visitors, and by applying Utah rather than Arkansas disciplinary rules and grooming policies. The *Glick* court acknowledged that under the Compact the sending state may conduct hearings to which the inmate is entitled in the receiving state's facility, and that in such proceedings the "governing law shall be that of the sending state." 28 V.S.A. § 1604(f). This did not mean, however, that all of the sending state's policies and procedures necessarily applied to transferred inmates. "A common sense reading of these provisions must allow authorities having daily, physical custody of a transferred inmate to determine the discipline, visitation, classification, and grooming aspects of the inmate's incarceration." *Glick,* 889 P.2d at 1393.

We conclude, accordingly, that plaintiffs here were not entitled, under the Compact, to the same visitation policy in out-of-state correctional facilities that applied in Vermont facilities.[2]

---

[2] Plaintiffs also claimed that the alleged violations of the Compact provided the basis for a 42 U.S.C. § 1983 civil rights action, asserting that Congressional authorization of such interstate compacts in the Crime Control Consent Act of 1934, 42 U.S.C. § 112, had "federalized" the law. Section 1983, of course, is not a source of independent substantive rights, but rather a means of redressing violations of federal statutory and constitutional law. See *Albright v. Oliver,* 510 U.S. 266, 271 (1994); *Maine v. Thiboutot,* 448 U.S. 1, 4 (1980). Most courts have held, however, that the Interstate Corrections Compact was not transformed into federal law through Congressional consent, and therefore cannot form the basis of a 42 U.S.C. § 1983 claim. See *Ghana,* 159 F.3d at 1208; *Jennings v. Lombardi,* 70 F.3d 994, 995 (8th Cir. 1995); *Stewart,* 924 F.2d at 142; *Griffin v. Riveland,* 148 F.R.D. 266, 269 (E.D. Wash. 1993). But cf. *Cameron v. Mills,* 645 F. Supp. 1119, 1128 (S.D. Iowa 1986); *Opinion of the Justices,* 184 N.E.2d 353, 355

## II.

■ Plaintiffs additionally contend that the routine transfer of Vermont inmates to out-of-state correctional facilities violates a provision of the Vermont Constitution calling for "visible punishments." Vt. Const. ch. II, § 64. The section in question provides, in its entirety, as follows:

> To deter more effectually from the commission of crimes, by continued visible punishments of long duration, and to make sanguinary punishments less necessary, means ought to be provided for punishing by hard labor, those who shall be convicted of crimes not capital, whereby the criminal shall be employed for the benefit of the public, or for the reparation of injuries done to private persons: and all persons at proper times ought to be permitted to see them at their labor.

Plaintiffs argue that the constitutional language calling for "visible punishments of . . . those who shall be convicted of crimes," and requiring that "all persons . . . ought to be permitted to see them at their labor," prohibits the out-of-state transfers. They rely principally upon historical materials showing that the framers of the first state constitutions were vitally concerned with penal reform, rejecting the harsh "sanguinary" punishments — such as whipping, branding, and mutilation — which were then common in favor of visible hard labor as a more humane and effective means of deterrence and rehabilitation. See M. Meskell, *An American Resolution: The History of Prisons in the United States from 1777 to 1877*, 51 Stan. L. Rev. 839, 841-47 (1999) (tracing evolution from colonial reliance upon harsh corporal punishments to institution of imprisonment at hard labor during late 1700's). Plaintiffs trace the influence of Cesare Beccaria and other notable Enlightenment theorists of penal reform upon William Penn and Benjamin Franklin in Pennsylvania, see *id.* at 843-45, which ultimately led to the enactment of § 39 of the Pennsylvania Constitution of 1776.[3] This section of the first Pennsylvania

---

(Mass. 1962). Having concluded that the contracts at issue did not violate the Compact, we need not resolve this issue.

[3] Section 39 of the Pennsylvania Constitution of 1776 provided as follows: "To deter more effectually from the commission of crimes, by continued visible punishments of long duration, and to make sanguinary punishments less necessary; houses ought to be provided for punishing by hard labour, those who shall be convicted of crimes not capital; wherein the criminals shall be imployed (sic) for the benefit of the public, or for

Constitution — like so many other provisions of that singular document — provided the model for Chapter II, § 35 of the Vermont Constitution of 1777, the precursor to § 64.[4]

Plaintiffs note that several other states during this period adopted similar constitutional prohibitions against "sanguinary" punishments. See, e.g., New Hampshire Constitution of 1784, art. 18 ("a multitude of sanguinary laws is both impolitic and unjust"); Maryland Constitution of 1776, Declaration of Rights, art. 16 ("sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State"). No states other than Pennsylvania and Vermont, however, adopted the requirement of "visible punishments," and the clause was deleted entirely from the revised Pennsylvania Constitution of 1790. Thus, as is often the case, we are left to interpret a unique eighteenth-century constitutional construct that has seen little change or interpretation over the last 200 years.

In addressing claims premised upon the Vermont Constitution, this Court has emphasized that our state constitution provides the "first and primary safeguard of the rights and liberties of all Vermonters," *Baker v. State*, 170 Vt. 194, 202, 744 A.2d 864, 870 (1999), and that "the motivating ideal of the framers" must continually inform our analysis of contemporary issues. *Id.* at 207, 744 A.2d at 874. Plaintiffs are well served, therefore, in seeking guidance from the historical and ideological forces surrounding the framing of the constitutional provision at issue. See *State v. Jewett*, 146 Vt. 221, 225-29, 500 A.2d 233, 234-38 (1985) (encouraging attorneys asserting state constitutional law claims to diligently develop and utilize historical materials).

Plaintiffs' claim ultimately fails, in our view, not through any fault of their research, but rather their logic. The argument that the

---

reparation of injuries done to private persons: And all persons at proper times shall be admitted to see the prisoners at their labour." Reprinted in *Constitutions of Pennsylvania* (J. Fertig & F. Hunter, eds. 1916) 236-37.

[4] The original version of the "visible punishments" clause in the Vermont Constitution of 1777 tracked Pennsylvania's clause nearly word for word. See *Records of the Council of Censors of the State of Vermont* (P. Gillies & G. Sanford, eds. 1991) 15. Apart from minor amendments in 1786 substituting the word "means" for "houses," and "them" for "the prisoners" in the last line, the provision has remained unchanged. See *id.* at 753. Only one published decision has considered the provision. In *Battick v. Stoneman*, 421 F. Supp. 213 (D. Vt. 1976), a Vermont prisoner unsuccessfully challenged a planned out-of-state transfer to a federal penitentiary on the ground that it violated his constitutional rights to due process and to be free from cruel and unusual punishments. The prisoner's complaint also asserted that the transfer violated § 64, Chapter II of the Vermont Constitution, but the court declined to address the claim, noting that it had been abandoned at trial, and that the right to "visible punishments" inured to the public, not the prisoner. *Id.* at 230 n.15.

fundamental purpose — the "motivating ideal" — of the framers was to replace brutal punishments with visible labor for the people to observe and "and be instructed by" is largely persuasive. What plaintiffs have failed to demonstrate is any *violation* of that motivating ideal. They have not shown how the deterrent principle at the heart of the provision is in any respect undermined or diminished by the transfer of a portion of Vermont's inmate population out of state.

Although plaintiffs note that several hundred inmates have been transferred from Vermont to out-of-state correctional facilities, they acknowledge that this is a fraction of Vermont's current inmate population. So long as Vermont citizens have access "at proper times" to those inmates remaining, the goal of deterrence through "visible punishments" would appear to be more than adequately served. We discern no logical basis to conclude that the instructive example of three-quarters or even half of those convicted of crimes in Vermont and sentenced to "hard labor" in Vermont prisons is any less effective a deterrent than a prison population composed of every Vermont inmate. In sum, we discern no violation of the constitutional ideal.

In an amicus curiae brief filed in support of plaintiffs, the Defender General offers an alternative analysis of § 64. It is argued that, in reality, the section was designed as an "anti-transportation" clause to forbid the common English practice of "banishment" or exile of prisoners.

The claim is questionable. The framers actually included a "transportation" clause in the first Vermont Constitution that had no antecedent in the Pennsylvania Constitution of 1776. It provided "[t]hat no person shall be liable to be transported out of this State, for trial, for any offence committed within this State." Vt. Const. of 1777, ch. I, § 19, reprinted in *Records of the Council of Censors* (P. Gillies & G. Sanford, eds. 1991) 8.[5] Other state constitutions reflected a similar concern that prisoners not be removed from the jurisdiction for trial. See, e.g., Md. Const. of 1776, Declaration of Rights, art. 20 ("That the trial of facts, where they arise, is one of the greatest securities of the lives, liberties and estate of the People"). Having determined independently to forbid the transportation of persons out of state *for trial*, it is reasonable to assume that — had they so desired — the framers could have also expressly prohibited the transporta-

---

[5]The provision was amended in 1786 by replacing the words "within the State" with "within the same." See *Records of the Council of Censors, supra,* at 724. Otherwise, the provision remains unchanged to this day. See Vt. Const., ch. I, art 21.

tion of prisoners out of state for offenses committed in Vermont. See, e.g., Illinois Const. of 1818, art. VIII, § 7 (providing "[t]hat no person shall be liable to be transported out of this state for any offence committed within the same").

Moreover, even assuming that a "transportation" prohibition was within the framers' intentions, the general view is that out-of-state transfer of prisoners for the purpose of alleviating overcrowding or other correctional goals is not punishment equivalent to banishment or transportation. In *Olim v. Wakinekona*, 461 U.S. 238, 248 n.9 (1983), the United States Supreme Court explicitly rejected a prisoner's claim that his out-of-state transfer was analogous to "banishment," observing that "respondent in no sense has been banished; his conviction, not the transfer, deprived him of his right freely to inhabit the State. The fact that his confinement takes place outside Hawaii is merely a fortuitous consequence of the fact that he must be confined, not an additional element of his punishment." In so holding, the Supreme Court cited this Court's earlier decision in *Girouard v. Hogan*, 135 Vt. 448, 378 A.2d 105 (1977), which similarly rejected a Vermont inmate's claim that his planned transfer to an out-of-state federal facility constituted the "punishment of exile, banishment or transportation." *Id.* at 449, 378 A.2d at 106. We concluded that the analogy "outruns the realities. . . . The fact that the confinement may take place outside of the State of Vermont is merely a fortuitous consequence of a properly invoked administrative decision and not a designed denial of the State of Vermont to him imposed as a penalty." *Id.* at 449-50, 378 A.2d at 106-07; see also *Battick v. Stoneman*, 421 F. Supp. 213, 229 (D. Vt. 1976) (rejecting claim that transfer of Vermont inmate to federal system was "punitive"); *Sayles v. Thompson*, 457 N.E.2d 440, 443-44 (Ill. 1983) (holding that transfer of Illinois inmates to out-of-state prisons under Interstate Corrections Compact did not violate anti-transportation clause of state constitution because purpose of transfers was not punitive). But cf. *Ray v. McCoy*, 321 S.E.2d 90, 92-93 (W. Va. 1984) (concluding that transfer of state inmates to federal correctional facilities in California violated state constitution's transportation clause).

We conclude, accordingly, that the transfer of Vermont inmates to out-of-state correctional facilities does not violate Chapter II, § 64 of the Vermont Constitution.

*Affirmed.*