NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 4

No. 22-AP-125

| | |
|---|---|
| Charles Ferry et al. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| City of Montpelier | October Term, 2022 |

Robert A. Mello, J.

Brady C. Toensing of DiGenova & Toensing, LLP, Washington, DC, Patrick N. Strawbridge of Consovoy McCarthy PLLC, Boston, Massachusetts, and James F. Hasson, Arlington, Virginia, for Plaintiffs-Appellants/Cross-Appellees.

Michael J. Tarrant II and K. Heather Devine of Tarrant, Gillies & Shems, Montpelier, for Defendant-Appellee/Cross-Appellant.

Susanne R. Young, Attorney General, Rachel E. Smith, Deputy Solicitor General, and Briana T. Hauser, Assistant Attorney General, Montpelier, for Appellee State.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **EATON, J.** In this declaratory-judgment action, we are asked to consider whether a statute allowing noncitizens to vote in City of Montpelier elections violates the voter-eligibility requirements set forth in Chapter II, § 42 of the Vermont Constitution. We conclude that the complaint alleges facts to establish standing at the pleadings stage for plaintiffs to bring their facial challenge to the statute. However, we conclude that the statute allowing noncitizens to vote in local Montpelier elections does not violate Chapter II, § 42 because that constitutional provision does not apply to local elections. We accordingly affirm the trial court's grant of the City's motion to dismiss.

¶ 2.    Chapter II, § 42 of the Vermont Constitution provides:

> Every person of the full age of eighteen years who is a citizen of the United States, having resided in this State for the period established by the General Assembly and who is of a quiet and peaceable behavior, and will take the following oath or affirmation, shall be entitled to all the privileges of a voter of this state:

> You solemnly swear (or affirm) that whenever you give your vote or suffrage, touching any matter that concerns the State of Vermont, you will do it so as in your conscience you shall judge will most conduce to the best good of the same, as established by the Constitution, without fear or favor of any person.

¶ 3.    Generally, voters in any Vermont election, whether local or statewide, are required to be United States citizens. See 17 V.S.A. § 2121(a)(1) (defining criteria for voter eligibility, which includes citizenship); id. § 2656 (stating qualifications to vote in municipal elections are same as those provided in chapter containing § 2121). In 2018, Montpelier voters approved a proposed amendment to the city's charter that would allow noncitizens to vote in its local elections. The Legislature authorized the amendment in 2021, overriding the Governor's veto. As enacted, the relevant provision of Montpelier's charter states, "Notwithstanding 17 V.S.A. § 2121(a)(1), any person may register to vote in Montpelier City elections who on election day is a citizen of the United States or a legal resident of the United States, provided that person otherwise meets the qualifications of 17 V.S.A. chapter 43." 24 V.S.A. App. Ch. 5, § 1501. Under the statute, a "legal resident of the United States" is "any noncitizen who resides in the United States on a permanent or indefinite basis in compliance with federal immigration laws." Id. § 1504(1). The City Clerk is required to maintain a separate "City voter checklist" from other voter checklists. Id. § 1502.

¶ 4.    Plaintiffs include two Montpelier residents who are United States citizens and registered to vote in Montpelier, eight Vermont voters who are United States citizens and reside in other localities in the state, the Vermont Republican Party, and the Republican National Committee. They filed a complaint in the civil division against the City and the City Clerk in his official capacity, seeking a declaratory judgment that Montpelier's new noncitizen voting charter

2

amendment violates Chapter II, § 42 of the Vermont Constitution, and an injunction to prevent defendants from registering noncitizens to vote in Montpelier.

¶ 5. The City moved to dismiss plaintiffs' complaint. It argued that plaintiffs lacked standing to bring their challenge because they did not allege a particularized injury, and that they failed to state a claim upon which relief could be granted because, as a matter of law, the charter provision does not violate Chapter II, § 42 of the Vermont Constitution. The State intervened to defend the constitutionality of the noncitizen voting charter provision but took no position on whether plaintiffs had standing.

¶ 6. Following a hearing, the trial court granted the City's motion to dismiss. It concluded that plaintiffs alleged sufficient facts in their complaint to establish standing under a vote-dilution theory because two plaintiffs were Montpelier residents whose votes in local elections would be directly impacted by the noncitizen-voting statute. However, looking to the history of Chapter II, § 42 and this Court's precedents, it concluded that the noncitizen-voting statute was constitutional.

¶ 7. Plaintiffs appealed the trial court's dismissal and the City cross-appealed its determination that plaintiffs pleaded sufficient facts to establish standing. Before us, plaintiffs argue that § 42, which requires voters to be citizens of the United States, applies to municipal elections and therefore the statute allowing noncitizens to vote in Montpelier local elections is unconstitutional. In support, they contend that § 42 unambiguously applies to votes "on any matter concerning the State of Vermont," and that local elections today have statewide implications that subject them to this constitutional provision. The State, on behalf of itself and the City, counters that this Court has a long line of precedent distinguishing between municipal and statewide elections and that those cases dictate that § 42 does not apply to municipal elections, even with the changes in the statewide impacts of such elections over time. The City argues that plaintiffs lack standing to challenge the statute because they failed to allege a personal, particularized injury.

¶ 8.     We review motions to dismiss without deference. Deutsche Bank v. Pinette, 2016 VT 71, ¶ 9, 202 Vt. 328, 149 A.3d 479. In doing so, "we assume as true the nonmoving party's factual allegations and accept all reasonable inferences that may be drawn from those facts." Murray v. City of Burlington, 2012 VT 11, ¶ 2, 191 Vt. 597, 44 A.3d 162 (mem.). Motions to dismiss for lack of subject-matter jurisdiction, V.R.C.P. 12(b)(1), and for failure to state a claim, V.R.C.P. 12(b)(6), "may not be granted unless it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Wool v. Off. of Pro. Regul., 2020 VT 44, ¶ 8, 212 Vt. 305, 236 A.3d 1250 (quotation omitted).

¶ 9.     We turn to standing first and conclude that plaintiffs alleged facts sufficient to establish standing at the pleadings stage. We then turn to the merits of plaintiffs' constitutional claims under Chapter II, § 42. We conclude that § 42 does not apply to municipal elections as a matter of law and therefore the trial court properly dismissed plaintiffs' complaint.

## I. Standing

¶ 10.     We begin, as we must, with standing.[1] See Ihinger v. Ihinger, 2003 VT 38, ¶ 5, 175 Vt. 520, 824 A.2d 601 (mem.) ("Because standing is a jurisdictional issue, we must first determine the merits of [this] threshold argument."). "Whether a plaintiff has standing is a legal question,

---

[1] We observe that at least twice in the past, this Court has addressed the merits in some form without first establishing that the plaintiffs had standing. See Daye v. State, 171 Vt. 475, 478, 769 A.2d 630, 633 (2000) (concluding that "even if plaintiffs had standing to assert the statutory and constitutional claims, they would fail on the merits"); Hinesburg Sand & Gravel Co. v. State, 166 Vt. 337, 344, 693 A.2d 1045, 1050 (1997) ("Although we affirm the dismissal based on lack of standing, we add that we do not believe the claim has merit under the Equal Protection Clause."). In both of those cases, evaluation of the plaintiffs' standing was closely intertwined with the substance of their claims. See Daye, 171 Vt. at 478, 769 A.2d at 633; Hinesburg Sand & Gravel Co., 166 Vt. at 344, 693 A.2d at 1050. We do not take such approach here. In this case, we conclude first that plaintiffs have standing and second that their claims fail on the merits. This is not internally inconsistent because for purposes of reviewing standing, we assume arguendo that plaintiffs' claims would be successful on the merits. See Wool, 2020 VT 44, ¶ 12 (explaining that denying constitutional standing based on whether plaintiff has right asserted "would be to resolve the matter on the merits and make the standing doctrine redundant").

which we review with no deference to the trial court." Taylor v. Town of Cabot, 2017 VT 92, ¶ 9, 205 Vt. 586, 178 A.3d 313.

¶ 11. Vermont courts' subject-matter jurisdiction is limited to "actual cases or controversies." Parker v. Town of Milton, 169 Vt. 74, 76-77, 726 A.2d 477, 480 (1998); see also In re Constitutionality of House Bill 88, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949) (adopting federal case-or-controversy requirement as part of separation-of-powers doctrine in Vermont Constitution and declining to issue advisory opinions). Standing is one of several prerequisites to satisfy the case-or-controversy requirement. See Hinesburg Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048 (explaining that case-or-controversy requirement "embodies various doctrines, including standing, mootness, ripeness and political question, that help define and limit the role of courts in a democratic society"). It is thus "fundamentally rooted in respect for the separation of powers of the independent branches of government." Id. "The gist of the question of standing is whether [the] plaintiff's stake in the outcome of the controversy is sufficient to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Turner v. Shumlin, 2017 VT 2, ¶ 10, 204 Vt. 78, 163 A.3d 1173 (per curiam) (quotation omitted).

¶ 12. This Court adopted a three-part test for standing originally articulated for federal courts: (1) injury in fact; (2) causation; and (3) redressability. Hinesburg Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048. In other words, to have standing, a plaintiff must "have suffered a particular injury that is attributable to the defendant and that can be redressed by a court of law." Parker, 169 Vt. at 77, 726 A.2d at 480. These requirements apply equally to petitions for declaratory judgment. Paige v. State, 2018 VT 136, ¶ 7, 209 Vt. 379, 205 A.3d 526.

¶ 13. The first and foremost requirement, injury in fact, depends on the nature of the right allegedly intruded upon.[2] Injury in fact is "the invasion of a legally protected interest." Hinesburg

_____

[2] Causation and redressability are not contested in this case.

5

Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048 (quotation omitted). Standing is a substantive issue separate from the merits of a plaintiff's case; however, they are "closely related." Wool, 2020 VT 44, ¶ 11. For this reason, standing is "gauged by the specific common-law, statutory or constitutional claims that a party presents." Hinesburg Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048 (quotation omitted). Thus, "[a]lthough standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," the question of whether the plaintiff has standing "often turns on the nature and source of the claim asserted." Warth v. Seldin, 422 U.S. 490, 500 (1975). "[A] party who is not injured has no standing to bring suit," U.S. Bank Nat'l Ass'n v. Kimball, 2011 VT 81, ¶ 12, 190 Vt. 210, 27 A.3d 1087; however, the nature of the inquiry into what constitutes an injury sufficient to establish standing cannot be uniform. See Warth, 422 U.S. at 500.

¶ 14. The parties and the trial court have relied on federal voting-rights cases to discuss whether plaintiffs alleged an injury in fact here. Because of this reliance, it is important to clarify the role of federal standing precedents in our standing analysis. We adopted our three-part test for standing from federal jurisprudence, Hinesburg Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048, and have frequently cited federal standing precedents when deciding Vermont cases involving adequate and independent state-law grounds. See, e.g., Turner, 2017 VT 2, ¶¶ 13-14 (citing federal precedents to discuss state-legislator standing). For this reason, the litigants before us often, and fairly, rely on federal precedents to argue issues regarding Vermont standing.

¶ 15. However, we wish to dispel any assumption that we are bound by each word stated in the United States Supreme Court's—and any other federal court's—standing precedents, particularly where those developments have occurred without discussion or mention in our case law. Vermont courts are not obliged to follow federal standing rules because standing therein is ultimately determined by the Vermont Constitution. See ASARCO Inc. v. Kadish, 490 U.S. 605, 617 (1989) (recognizing that constraints in Article III of U.S. Constitution do not apply to state

6

courts and therefore state courts are not bound by federal case-or-controversy or justiciability rules); Constitutionality of House Bill 88, 115 Vt. at 529, 64 A.2d at 172 (identifying Vermont Constitution as source of our case-or-controversy requirement (citing Vt. Const. ch. II, § 5)). "When this [C]ourt cites federal or other State court opinions in construing provisions of the Vermont Constitution or statutes, we rely on those precedents merely for guidance and do not consider our results bound by those decisions." State v. Wood, 148 Vt. 479, 482 n.2, 536 A.2d 902, 904 n.2 (1987) (quotation omitted). This is as true of our case-or-controversy requirement, and by extension our standing requirement. Therefore, to the extent any litigant's arguments presuppose that Vermont standing law shifts as federal standing law is refined, regardless of whether the issues presented in those federal cases have been presented to this Court for review, that is not the case. See State v. Jewett, 146 Vt. 221, 224, 500 A.2d 233, 235 (1985) (explaining that Vermont constitutional jurisprudence must be developed no matter "however the philosophy of the United States Supreme Court may ebb and flow").

¶ 16. Federal standing case law is notoriously complicated. See United States ex rel. Chapman v. Fed. Power Comm'n, 345 U.S. 153, 156 (1953) (observing that standing is "complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations"). It is therefore essential that the incremental development of Vermont standing law be fastidiously pursued through reason rather than assumption. See Jewett, 146 Vt. at 224, 500 A.2d at 335 (explaining that we will not use state constitution to "evade the impact of the decisions of the United States Supreme Court" but that "[o]ur decisions must be principled, not result-oriented"). Taking this measured approach also furthers one of the core purposes of the standing doctrine, ensuring our standing precedents are developed through actual cases and controversies presented to this Court. See Hinesburg Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048.

¶ 17. Having clarified the role of federal precedent, we now turn to whether the cases cited in the briefing are persuasive here. The parties use federal precedents to argue about whether plaintiffs' alleged injury is sufficiently particularized to constitute an injury in fact. For example, plaintiffs use the term "vote dilution" to describe their injury and the parties accordingly rely on federal voter-standing precedents that use this term. However, "vote dilution" is a special term in the federal system derived from its application in equal-protection and apportionment cases. See Gill v. Whitford, 138 S. Ct. 1916, 1930 (2018) (detailing vote dilution's origins in partisan gerrymandering and extension to racial gerrymandering). In such cases, the intrusion of a protected interest, both in terms of standing and the merits, is inherently comparative due to the nature of the claims raised. See id. at 1935 (Kagan, J., concurring) (explaining that vote dilution claim "arises when an election practice—most commonly, the drawing of district lines—devalues one citizen's vote as compared to others"); see also Vill. of Willowbrook v. Oleh, 528 U.S. 562, 564 (2000) (per curiam) (discussing equal protection claim in terms of being "treated differently from others similarly situated"). The case before us is different from those. The merits of a § 42 claim and therefore the nature of the interest allegedly intruded for standing purposes is not inherently comparative. See Vt. Const. ch. II, § 42 (providing voter's qualifications and oath). Thus, although the parties argue over where this case fits within federal "vote dilution" standing precedents, that obscures the question presented. Plaintiffs do not raise an equal-protection claim, or any other federal claim.

¶ 18. Standing is closely related to the merits. What matters is not whether plaintiffs are using a federal term correctly, it is whether the facts plaintiffs allege demonstrate that they have been injured in fact under § 42. See Wood, 148 Vt. at 487, 536 A.2d at 907 (declining to apply standing test for claims raised under Fourth Amendment to United States Constitution articulated by United States Supreme Court to claims raised under Article 11 of Vermont Constitution, and adopting independent standing approach based on scope of rights protected under Article 11). As

8

the parties analogize federal standing cases discussing "vote dilution" and other voting-rights contexts, what rises to the surface is the false premise that the standing issue presented in this case has been decided under federal precedents. Indeed, it cannot have been. This case presents a uniquely Vermont constitutional question—what is required for a plaintiff to establish standing where the alleged injury is derived from a violation of Chapter II, § 42 of the Vermont Constitution?

¶ 19. Because the United States Constitution contains no parallel to § 42, there is no directly applicable federal precedent on which we could rely to answer this question. For this reason, we do not find the federal standing cases on voter issues cited in the briefing, which rely on very different underlying legal claims, to be persuasive here. See Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 151-52 (1970) (explaining that "[g]eneralizations about standing to sue are largely worthless" and pointing out that two cases with same case-and-controversy starting point "do not necessarily track one another"). This is also a question we have not encountered in our own standing precedents. To answer it, we must return to the beginning of what it means to be injured in fact under Chapter II, § 42, relying on the language of § 42 to discern the interest plaintiffs have therein. See Wood, 148 Vt. at 489, 536 A.2d at 907 (using Article 11 itself to determine scope of right protected and who could invoke right's protection in court); Hinesburg Sand & Gravel Co., 166 Vt. at 342, 693 A.2d at 1048-49 (looking to scope of rights under Equal Protection Clause to conclude plaintiff lacked standing). We then proceed to develop a test for when a plaintiff can assert an invasion of that interest in a Vermont court.

¶ 20. Chapter II of the Vermont Constitution "was intended to present a frame of government and a mode of election for future generations." Temple v. Mead, 4 Vt. 535, 540 (1832). Section 42, titled "Voter's qualifications and oath," defines who is entitled to "the privileges of a voter in this state." Vt. Const. ch. II, § 42. In other words, it creates the lawful voter pool for elections to which its provisions apply. It is axiomatic that the right to vote is

9

"individual and personal in nature." Gill, 138 S. Ct. at 1920 (quotation omitted). Further, "[i]t is beyond cavil that the rights of qualified voters to cast votes effectively and the rights of individuals to associate for political purposes are of the most fundamental significance under our constitutional structure." Trudell v. State, 2013 VT 18, ¶ 7, 193 Vt. 515, 71 A.3d 1235 (quotation omitted).

¶ 21.    When we look to the purpose of § 42 with these fundamental aspects of the right to vote in mind, two principles can be derived from its creation of an eligible voter pool. One, a person who meets the qualifications has the right to be part of the voter pool. See Martin v. Fullam, 90 Vt. 163, 169, 97 A. 442, 444 (1916) (stating persons qualified to vote under § 42 have "privilege to exercise the right of voting" on issues falling under § 42's purview). Two, a person legally voting within the pool has an interest in ensuring that the voter pool in which they are participating is constitutionally sound to preserve the effectiveness of their vote. See Trudell, 2013 VT 18, ¶ 7 (stating that right to vote includes right to "cast votes effectively"); Duncan v. Coffee Cnty., 69 F.3d 88, 94, 94 n.3 (6th Cir. 1995) (stating, as matter of fact, that increasing voter pool has impact on effectiveness of individual votes). We conclude, consistent with these principles, that a plaintiff alleges an injury in fact and thus has standing to sue under Chapter II, § 42 bringing a facial challenge to a law when: that law on its face changes the qualifications for voters as defined in § 42 and the plaintiff is a voter within the voter pool for which those qualifications have been changed.[3]

---

[3] This definition of injury obviates the need to analyze causation and redressability separately for Chapter II, § 42 claims. If a law on its face changes voter qualifications as defined in § 42, then a government action has caused the injury described. Moreover, this Court can redress that injury by finding the law unconstitutional.

This framework dictates how a voter's individual interests in § 42 can be violated. This test is consistent with our standing precedents because it does not allow for third parties to raise another person's legal rights, nor does it constitute a generalized harm to the public—under § 42, one is injured as an individual voter within a specific voter pool and not as a citizen who cares about government acting according to the law. See Baird v. City of Burlington, 2016 VT 6, ¶ 15, 201 Vt. 112, 136 A.3d 223 (detailing general rule against third-party standing); Paige, 2018 VT 136, ¶ 9 (requiring injury to be "invasion of legally protected interest" rather than "generalized harm to the public" (quotation omitted). To the extent words like "particularized" and

¶ 22. Now we turn to the substance of plaintiffs' complaint. We have repeatedly emphasized that Vermont has "extremely liberal" notice-pleading standards. Mahoney v. Tara, LLC, 2014 VT 90, ¶ 15, 197 Vt. 412, 107 A.3d 887. In evaluating a complaint, we not only accept the plaintiff's factual allegations as true, we also "accept all reasonable inferences that may be drawn from those facts." Murray, 2012 VT 11, ¶ 2.

¶ 23. Here, the charter amendment explicitly allows noncitizens to vote in Montpelier elections. 24 V.S.A. App. Ch. 5, § 1501. Chapter II, § 42 requires citizenship to vote. Vt. Const. ch. II, § 42. The amendment therefore changes the qualifications of voters in Montpelier in a way that is inconsistent with what is provided in § 42. The two Montpelier plaintiffs are residents of and registered to vote in Montpelier. It is reasonable to infer from plaintiffs' complaint that the two Montpelier registered voters will vote in future Montpelier municipal elections. Their very decision to bring a lawsuit to challenge a law that "expand[s]" the electorate in which they vote indicates that they have an interest in voting and participating in a lawful voter pool, and that they believe the charter amendment impacts this interest. They are accordingly in the voter pool for which the challenged law has changed voter qualifications and have therefore demonstrated that they have standing at the pleadings stage. To be sure, we make no comment on whether the allegations in the complaint could have survived a summary-judgment motion challenging standing or whether plaintiffs could meet their burden to prove standing at trial. See N.A.A.C.P., Bos. Chapter v. Harris, 607 F.2d 514, 526 (1st Cir. 1979) (explaining that even plaintiff who survives motion to dismiss for lack of standing "must continue to carry the burden of proof on standing" and "must prove the facts essential to support their claim to standing" at trial).

¶ 24. To clarify, we conclude only that Chapter II, § 42 is unique and we therefore must determine how the injury in fact requirement as articulated in Vermont precedents can be

---

"generalized" have been used to limit voter standing in the federal context, as we stated above, we do not find those cases applicable to § 42 standing. We accordingly find the City's arguments, relying on federal case law, that there is no particularized injury here to be unpersuasive.

established for an alleged violation of it. Relying on federal standing precedents to analogize rather than returning to the origins of the meaning of "injury in fact" under a specific claim is workable and applicable for other Vermont law claims, but not this one. To the extent we have refined the meaning of "injury in fact" for standing purposes in other contexts, we do not disturb those refinements. Compare, e.g., Paige, 2018 VT 136, ¶ 13 (citing federal case to explain how taxpayer was not personally affected by law in way to confer standing), with Taylor, 2017 VT 92, ¶ 11 (explaining how municipal taxpayers may have standing in Vermont where federal taxpayers do not have standing in federal courts and concluding that this is not inconsistent with federal law).

¶ 25. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 5 U.S. 137, 163 (1803). As advocates have a duty to raise state constitutional issues below and diligently develop them for appellate review, "[i]t is the corresponding obligation of the Vermont Supreme Court, when state constitutional questions of possible merit have been raised, to address them" when necessarily and properly presented. Jewett, 146 Vt. at 229, 500 A.2d at 238. Plaintiffs' complaint adequately alleges facts establishing standing for the two Montpelier residents to argue their claimed injury under Chapter II, § 42 of the Vermont Constitution at the pleadings stage. We must therefore review the merits of their claims. Because we conclude that the two Montpelier plaintiffs have standing at this procedural stage, we need not address the standing of the remaining plaintiffs. See Turner, 2017 VT 2, ¶ 16 n.3.

## II. Merits

¶ 26. Having concluded that plaintiffs established standing for purposes of the pleadings stage, we turn to the merits of their constitutional arguments. Our review of the facial constitutionality of a statute is plenary and nondeferential. State v. Noll, 2018 VT 106, ¶ 21, 208 Vt. 474, 199 A.3d 1054. "In a facial challenge, a litigant argues that no set of circumstances exists under which a statute or regulation could be valid" and requests the court "invalidate the contested

law." In re Mountain Top Inn & Resort, 2020 VT 57, ¶ 22, 212 Vt. 554, 238 A.3d 637 (quotation and brackets omitted). Statutes are presumed constitutional, which creates a "very weighty burden" for the proponent of a constitutional challenge to overcome. Badgley v. Walton, 2010 VT 68, ¶ 20, 188 Vt. 367, 10 A.3d 469. "In construing our [C]onstitution, we have available a number of approaches in addition to our own precedents: examination of the text, historical analysis, sibling state constructions of similar provisions, and analysis of economic and sociological materials." Chittenden Town Sch. Dist. v. Dep't of Educ., 169 Vt. 310, 320, 738 A.2d 539, 547 (1999).

¶ 27. We begin with the text itself; however, because § 42 is an older constitutional provision with a complicated history, our analysis of the text requires historical analysis. When we look to the plain text of a constitutional provision, we often simultaneously rely "on historical context to illuminate [its] meaning." State v. Misch, 2021 VT 10, ¶ 12, 214 Vt. 309, 256 A.3d 519 (per curiam) (quotation omitted); see also Turner, 2017 VT 2, ¶ 24 ("The standards for interpreting constitutional language and meaning, though related, are not the same as for ordinary statutes. Canons of construction, if applied, must be used more cautiously and sometimes differently." (quotation omitted)). Historical context is particularly salient for older constitutional provisions because "we are trying to make the best sense we can of an historical event—someone, or a social group with particular responsibilities, speaking or writing in a particular way on a particular occasion." Chittenden Town Sch. Dist., 169 Vt. at 327, 738 A.2d at 552 (quotation omitted). To achieve our objective, we therefore begin with an overview of § 42's history and then move into our precedents interpreting its text.

¶ 28. Section 42 is as old as Vermont. In 1777, Vermont formed as an independent republic and adopted its first constitution, substantially modeled after the Pennsylvania Constitution of 1776. G. Aichele, Making the Vermont Constitution: 1777-1824, 56 Vt. Hist. Soc'y 166, 175 (1988), https://vermonthistory.org/journal/misc/MakingVermontConstitution.pdf

13

[https://perma.cc/QD8W-8XRE]. The Vermont Constitution of 1777 was divided into two parts: Chapter I, "A Declaration of the Rights of the Inhabitants of the State of Vermont," and Chapter II, "Plan or Frame of Government." Vt. Const. of 1777, https://sos.vermont.gov/vsara/learn/constitution/1777-constitution/ [https://perma.cc/A4DU-TUES]. It contained a provision governing the qualifications of individuals entitled to "the privileges of a freeman," which stated, in full, as follows:

> Every man of the full age of twenty-one years, having resided in this State for the space of one whole year, next before the election of representatives, and who is of a quiet and peaceable behavior, and will take the following oath (or affirmation), shall be entitled to all the privileges of a freeman in this State.
>
> "I . . . solemnly swear, by the ever living God (or affirm in the presence of Almighty God [sic] that whenever I am called to give my vote or suffrage, touching any matter that concerns the State of Vermont, I will do it so, as in my conscience, I shall judge will most conduce the best good of the same, as established by the constitution, without fear or favor of any man."

Vt. Const. of 1777 ch. II, § 6.

¶ 29. Vermont adopted a new constitution in 1786 to effectuate substantial amendments and again in 1793 after it joined the United States as the fourteenth state in 1791. The 1786 and 1793 constitutions retained the two-part structure of the 1777 Constitution and both included the provision above detailing the qualifications to exercise the "privileges of a freeman" with minor adjustments to the language in the voter's oath. Vt. Const. of 1786 ch. II, § 18, https://sos.vermont.gov/vsara/learn/constitution/1786-constitution/, [https://perma.cc/Z5EC-G9KW]; Vt. Const. ch. II, § 21 (1793). The 1793 Constitution is Vermont's current constitution.

¶ 30. The freemen-qualifications provision itself however has since been amended. In 1827, the Council of Censors, a body of elected individuals with the power to call conventions to consider amendments to the Vermont Constitution, noted the absence of an express citizenship requirement for the qualifications of freemen in the Constitution and appointed a committee "to inquire whether the right of suffrage can be legally exercised in this state by persons not owing

14

allegiance to the government of the United States, and whether it be expedient to recommend any alteration of the constitution or existing stature on that subject." J. Douglas, Sec'y of State of Vt., Records of the Council of Censors of the State of Vermont xi-xii, 283 (P. Gillies & G. Sanford eds., 1991), https://sos.vermont.gov/media/4aamkeww/council_of_censors.pdf [https://perma.cc/8JEP-5EY2]. The committee observed that the constitutional provision as written was ambiguous as to whether noncitizens had the right of suffrage and recommended it be amended to explain that "no person, not a native-born citizen of this or some one of the United States, shall be entitled to exercise the right of suffrage unless naturalized agreeably to the acts of Congress." Id. at 298-99. Pursuant to the Council's proposal, the Constitution was amended at the Constitutional Convention of 1828 to state: "No person, who is not already a freeman of this state, shall be entitled to exercise the privileges of a freeman, unless he be a natural born citizen of this, or some one of the United States, or until he shall have been naturalized agreeably to the acts of Congress." Id. at 306, 311.

¶ 31. In 1924, the provision was amended again to recognize women's suffrage, becoming:

> Every person of the full age of twenty-one years, who is a natural born citizen of this or some one of the United States or who has been naturalized agreeably to the Acts of Congress, having resided in this state for the space of one whole year next before the election of representatives, and who is of a quiet and peaceable behavior, and will take the following oath or affirmation, shall be entitled to all the privileges of a freeman in this state[.]

Id. at 706, 743-44; Art. Amend. 40 (1924). Then, in 1974, the General Assembly amended the provision to reduce the voting age from twenty-one to eighteen and to replace the one-year residency requirement with a residency period "established by the General Assembly." Id. at 743-44. In 1994, the General Assembly added Temporary Provision § 76 to the Constitution, which authorized the Justices of this Court to revise the Constitution "in gender inclusive language." Vt. Const. ch. II, § 76 (formerly Art. Amend. 52 (1994)). However, these revisions did "not alter the

sense, meaning or effect" of any section of the Vermont Constitution.  Id.  Pursuant to § 76, the header for the part of the Constitution containing § 42 was changed from "Qualifications of Freemen" to "Qualifications of Freemen and Freewomen."  Letter from Frederic W. Allen, Chief Justice, Vermont Supreme Court, to Donald M. Hooper, Vt. Sec'y of State 11 (Feb. 14, 1994) [https://perma.cc/8LAS-548T] (containing gender-inclusive revisions certified by Justices to Secretary of State pursuant to § 76).  Section 42 itself was retitled from "Freeman's qualifications and oath" to "Voter's qualifications and oath," and the text of the provision replaced the word "freeman" with "voter."[4]  Id.  The voter's oath remained unchanged throughout these amendments. Douglas, supra, at 706.

¶ 32.   From this history, we know that "voter" in § 42 is synonymous with "freeman,"[5] and since 1828, at the latest, citizenship has been required to exercise the "privileges of a freeman in this State."  The operative question then becomes: what does it mean to have the "privileges of a freeman" under § 42?

¶ 33.   Our precedents answer this question.  The first of two pertinent cases is State v. Marsh, N. Chip. 17 (1789).  Decided three years after the 1786 Constitution's promulgation, the question presented in Marsh was whether the constable for a town had been legally appointed where his name was given to the town clerk orally but § 31 of the 1786 Constitution stated, "All elections, whether by the people, or in the General Assembly, shall be by ballot . . . ."  Id. at 17 (quotation omitted).  This Court held that § 31 did not extend to the choice of town officers.  Id. at

---

[4]  Section 42 was amended in 2010 to add language not relevant to this appeal.  Vt. Const. Ann. ch. II, § 42 (2015).

[5]   Historically, a "freeman" is a person "who enjoys all the civil and political rights belonging to the people under a free government."  Freeman, Black's Law Dictionary (11th ed. 2019).  Suffrage being one such political right, "freeman" has been used in various contexts to mean a person qualified to vote in an election or run for office.  See, e.g., McLinko v. Dep't of State, 279 A.3d 539, 557 (Pa. 2022) (explaining that under original Pennsylvania constitution, "freemen" meant "[t]hose qualified to vote in elections and to run for office at that time").  There is no dispute in this case that "freeman" in § 42 pertains specifically to the context of voting rights.

18. It explained that "[t]he framers of the constitution were forming a plan for the general government of the State" and did "not appear to have had an eye on the internal regulation of lesser corporations" like towns. Id. Looking to the text of § 31, it concluded that "the people" meant "the collective body of the people, who have a right to vote in such elections," and is synonymous with "freemen." Id. It went on to state that an "election" by the "freemen" "is, in every part of the Constitution, used in the same appropriate sense"—to refer to an election of statewide representatives. Id. Although Marsh deals with a different provision and with the 1786 Constitution,[6] it illuminates that around the time the framers were crafting the language in § 42, the word "freeman" in the Vermont Constitution was used to identify persons with the ability to vote in statewide elections as opposed to voters in municipal elections. See, e.g., Misch, 2021 VT 10, ¶ 12 (using 1777 Constitution and related sources to construe contemporary constitutional provisions that originated from it); Baker v. State, 170 Vt. 194, 207, 744 A.2d 864, 874 (1999) (same). It is also significant in its emphasis that Chapter II as a whole is targeted towards the "general government of the State." Marsh, N. Chip. at 18.

¶ 34. Next is Woodcock v. Bolster, 35 Vt. 632 (1863), which is directly on point. In Woodcock, this Court had to determine whether a noncitizen could hold local office and, by extension, whether noncitizens could vote in local elections. See id. at 637-38 (noting that right to hold local office and right to vote in local elections were equally implicated by arguments presented in case). The plaintiff in that case argued that only "freemen"—those "who are entitled to vote for representatives to the legislature, and for county and state officers"—were entitled to vote in town and school district meetings. Id. at 638. At the time this case was decided, the Vermont Constitution stated: "No person, who is not already a freeman of this state, shall be

---

    [6] Both parties refer to the constitution at issue in this case as the 1777 Constitution. However, Marsh was decided three years after the 1786 Constitution was approved. Also, Marsh refers to § 31 as requiring a ballot, which is the correct section citation for the 1786 Constitution, Vt. Const. of 1786 ch. II, § 31; it would have been § 29 in the 1777 Constitution. Vt. Const. of 1777 ch. II, § 29.

entitled to exercise the privileges of a freeman, unless he be a natural born citizen of this, or some one of the United States, or until he shall have been naturalized agreeably to the acts of Congress." See supra, ¶ 30. The relevant statutes on municipal voting had been the same since the beginning of Vermont's statehood and contained no reference to a citizenship requirement nor the word "freeman." Woodcock, 35 Vt. at 638. Instead, municipal voter qualifications related to age, local residence, and taxation. Id. The plaintiff argued that although citizenship was not explicitly required, the statutes in question imposed the same qualifications as the Vermont Constitution prior to the 1828 amendment. The plaintiff therefore proposed that the 1828 amendment's explicit prohibition on noncitizen voting extended to the statutes in question.

¶ 35. This Court disagreed and held that a noncitizen could vote for and be elected to local office. Id. at 640-41. We rejected the premise that the statutory qualifications for local voting were ever synonymous with the constitutional qualifications for freemen. Id. at 638. We explained that under the original language of the 1793 constitutional provision, a noncitizen could be a freeman and therefore "vote for representatives to the legislature and for state officers" by residing in this state for a year and taking the freeman's oath. Id. at 639. However, that same noncitizen could still be unable to vote in a local election because he was not a taxpayer. Id. In explaining this discrepancy between statewide and local voter eligibility, this Court stated, "[i]t has not been questioned but that it is actually within the power of the [L]egislature to regulate the right of voting in such [local] meeting, and the right of holding office, according to their pleasure, and that there is nothing in the constitution restraining its exercise." Id. The Court also rejected policy arguments that it would be incongruous to allow a nonfreeman to hold an office where one duty was to act as a certifying officer at freemen's meetings and that noncitizens were generally unfit to vote or hold local office. Id. at 640. In sum, Woodcock is clear that the constitutional citizenship requirements for freemen do not apply to municipal voters.

¶ 36.   Marsh and Woodcock demonstrate that a "freeman" is an individual with the ability to vote in statewide elections in Vermont.  Therefore, under § 42, to exercise the "privileges of a freeman in this State" is to vote in statewide elections.  These two precedents draw a distinction between statewide and local elections for purposes of the Vermont Constitution's voting requirements.  The distinction drawn is categorical, and we accordingly reject plaintiffs' contention that these cases create a flexible, case-specific sliding scale for identifying local versus statewide issues and therefore what voter eligibility requirements must be met for any given election.  These cases dictate that § 42 does not apply to municipal elections.

¶ 37.   Since Woodcock, various precedents have reinforced the delineation between the regulation of statewide versus local elections.  See Town of Bennington v. Park, 50 Vt. 178, 200 (1877) ("The Legislature has the undoubted right to prescribe the mode of voting by towns, school districts, and other municipal organizations . . . .  The qualifications of voters in town meetings are prescribed by the legislature, and they are quite unlike those of freemen in freemen's meetings."); Rowell v. Horton, 58 Vt. 1, 5, 3 A. 906, 907 (1886) (concluding that constitutional provision mandating officials take oath of office contained therein applied only to state officers and not municipal officers); Martin, 90 Vt. at 172, 97 A. at 446 (concluding that freeman who was ineligible to vote in town meeting due to failure to pay taxes was still able to vote on statewide referenda); Slayton v. Town of Randolph, 108 Vt. 288, 288, 187 A. 383, 384 (1936) (distinguishing between statewide and local voting issues and determining freeman who failed to pay taxes could be prevented from voting on local issue).  Noncitizens are not the only group constitutionally excluded from voting in statewide elections under the freeman-qualifications provision who were historically able to vote in municipal elections. The Legislature passed statutes permitting women to vote in local elections and hold local office while the Vermont Constitution still extended statewide suffrage only to men.  See Sch. Dist. No. 1 v. Town of Bridport, 63 Vt. 383, 387-88, 22 A. 570, 571 (1891); State ex rel. Martin v. Foley, 89 Vt. 193, 197-98, 94 A. 841, 843-44 (1915).

19

Although no constitutional challenge to women's qualification to vote in local elections was ever presented to this Court, these cases fit into a general historical understanding that local elections are subject to different voter qualifications from statewide elections and therefore do not fall under the purview of the Vermont Constitution's freemen-qualifications provision. Our subsequent case law and the Legislature's subsequent actions are therefore consistent with our conclusions in Marsh and Woodcock.

¶ 38. The text of § 42 reviewed through a historical lens and our precedents support the conclusion that § 42 does not apply to municipal elections. This has been the established rule since Woodcock and subsequent developments in our case law have not undermined it.

¶ 39. Plaintiffs assert that this conclusion is incorrect. First, they argue that the plain text of § 42 clearly applies to voters in all Vermont elections. Second, they propose that the categorical conclusion that § 42 does not apply to municipal elections in our precedents is predicated on historical distinctions between local and statewide elections that no longer exist. Therefore, they assert that § 42 should properly apply to any election with an extra-municipal impact. They then list various examples of extra-municipal impacts to demonstrate that local elections today should be treated like statewide elections and therefore be limited to citizen voters. They specifically identify the fact that municipalities are subsidized by the state and that local officials serve on boards with extra-municipal impacts to explain why they believe all Vermont elections today involve "freemen's" issues.

¶ 40. It is important to understand what plaintiffs' arguments ask of this Court. Plaintiffs insist that their position does not require us to overrule precedent. However, they also rely heavily on changes over time which they propose render certain precedent, like Woodcock, "outmoded." Arguing that precedent should not be applied because of changes over time is asking this Court to abrogate or overrule precedent. See Demag v. Better Power Equip., Inc., 2014 VT 78, ¶ 14, 197 Vt. 176, 102 A.3d 1101 (recognizing that changes in social and economic circumstances over time

20

may require deviation from precedent). Thus, although plaintiffs do not rely on principles of stare decisis to make their case, we conclude it is a necessary lens through which to evaluate their arguments. "[T]his Court is not a slavish adherent to the principle of stare decisis, but we will not deviate from policies essential to certainty, stability, and predictability in the law absent plain justification supported by our community's ever-evolving circumstances and experiences." State v. Carrolton, 2011 VT 131, ¶ 15, 191 Vt. 68, 39 A.3d 705. Plaintiffs' arguments do not convince us that Woodcock and surrounding precedents were wrongly decided then or that changed circumstances since those decisions require us to reach a different conclusion now.

¶ 41. We turn first to plaintiffs' plain-text argument and conclude that the text of § 42 does not require its application to municipal elections. Although § 42 states that it describes the qualifications for a "voter of this state," we cannot read this language in isolation of § 42's history. See Chittenden Town Sch. Dist., 169 Vt. at 326-27, 738 A.2d at 551-52 (warning against "excessive reliance on a plain meaning approach to constitutional interpretation" and explaining that canons of constitutional construction do not follow statutory interpretation's canonical hierarchy). By "voter" the provision means "freeman," and the historical analysis above and accompanying precedents demonstrate that a "freeman" in this context meant a person who could vote in statewide elections. Supra, ¶ 36. The language in the voter's oath does not undermine this conclusion. The oath states that it applies when an individual gives their vote "touching any matter that concerns the State of Vermont." Vt. Const. ch. II, § 42. When read together with the qualifications for "freeman," "touching any matter that concerns the State of Vermont" refers to matters concerning state government as opposed to local government. See State v. Lohr, 2020 VT 41, ¶ 7, 212 Vt. 289, 238 A.3d 1277 (explaining that when construing constitutional provision, "we do not read sentences or phrases in isolation" and instead "examine the whole and every part of a provision, together with others governing the same subject matter, as parts of a system" (quotation omitted)).

21

¶ 42. Moreover, the language in the voter's oath has existed relatively unchanged since a time when persons who were not citizens of the United States but were Vermonters could vote here because Vermont was not yet a state. The oath was also in place throughout this Court's decisions cited in this opinion. Supra, ¶¶ 29-31. It would be inconsistent to read the voter's oath itself as requiring something incompatible with what the framers intended when they first drafted the other portions of the provision in 1777. It is also notable that the language of the oath was not modified with the 1828 amendment clarifying the requirement for citizenship to exercise the privileges of a freeman. This reading of the voter's oath also fits within the context of our decisions holding that local officers are not required to take the oath of office prescribed in the Vermont Constitution. See Rowell, 58 Vt. at 6, 3 A. at 907-08; Bixby v. Roscoe, 85 Vt. 105, 114, 81 A. 255, 259 (1911); see also Woodcock, 35 Vt. at 638 (identifying link between right to vote in municipal elections and right to hold municipal office); Lohr, 2020 VT 41, ¶ 7 (stating that we may look to related constitutional provisions on same subject matter to aid construction). In other words, the language in the voter's oath does not convince us that our precedents were wrongly decided at the time they were issued.

¶ 43. We now turn to the argument that Woodcock is obsolete because the nature of municipal elections has changed so substantially that "all Vermont elections affect statewide affairs and therefore must be conducted in accordance with" § 42. The scope of plaintiffs' challenge to the statute is important here. In a successful facial challenge, there is "no set of circumstances under which a statute or regulation could be valid" and therefore the court will "invalidate the contested law." Mountain Top Inn & Resort, 2020 VT 57, ¶ 22 (quotation omitted). However, in a successful as-applied challenge, the party demonstrates that "a statute or regulation is invalid as applied to the facts of a specific case" and the court will grant relief to the parties before it but will "not necessarily invalidate the contested law in its entirety." Id. A proponent asserting a facial challenge has a "heavy burden" and the fact that a statute "might operate

22

unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." United States v. Salerno, 481 U.S. 739, 745 (1987).

¶ 44. When we construe older constitutional provisions, we by no means ignore changes over time. "The challenge is to remain faithful to th[e] historical ideal [of the framers], while addressing contemporary issues that the framers undoubtedly could never have imagined." Baker, 170 Vt. at 207, 744 A.2d at 874. Our precedents can help us ascertain this vision and provide insights into historical understandings about the structure of Vermont's Constitution and government in relation to local voting. The Vermont Constitution is and always has been divided into two parts: Chapter I, containing a declaration of rights, and Chapter II, containing the "Plan or Frame of Government." Supra, ¶ 28. This Court has stated that the framers drafted Chapter II with an intent to form "a plan for the general government of the State." Marsh, N. Chip at 18; see also Rowell, 58 Vt. at 5, 3 A. at 907 ("Chapter [II] of the constitution . . . relates to the plan or frame of the state government . . . . It has no reference to the plan and frame of town governments, nor to the qualifications of voters therein . . . ."). The idea that the Constitution sought to provide a framework for statewide government specifically and therefore the provisions in Chapter II do not apply to local government, which is structurally subordinate to and distinguishable from statewide government, is prevalent throughout our precedents discussed above. See supra, ¶¶ 33-35, 37.

¶ 45. Fundamental aspects regarding municipalities to this day fit with the distinction our case law draws between municipal and statewide elections. Municipalities in Vermont "are created by the Legislature pursuant to express authority conferred by the Constitution" and their powers are "expressly delegated to them by legislative enactment" such that they have "no rights . . . outside the limits of legislative control." Park, 50 Vt. at 202; see also Vt. Const. ch. II, § 6 (listing ability to "constitute towns, borroughs, cities and counties" as part of legislative powers); Rowell, 58 Vt. at 5-6, 3 A. at 907 (explaining that towns are creatures of statute).

23

Moreover, once created, a municipality still "has only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof." City of Montpelier v. Barnett, 2012 VT 32, ¶ 20, 191 Vt. 441, 49 A.3d 120 (quotation omitted).

¶ 46. Further, there are limitations on the Legislature's ability to delegate power to a municipality. "In this State as elsewhere it is a doctrine well established and frequently reiterated by the courts that the functions of the Legislature which are purely and strictly legislative cannot be delegated but must be exercised by it alone." Stowe Citizens for Responsible Gov't v. State, 169 Vt. 559, 560, 730 A.2d 573, 575 (1999) (mem.) (quotation omitted). Under this doctrine, a municipality may be given "certain powers of legislation as to matters purely of local concern" or "the authority or discretion merely to execute, rather than make, the laws." Id. at 560-61, 730 A.2d at 575-76 (quotation omitted). Despite these connections to statewide government, municipalities generally remain entities that control local affairs. See, e.g., 17 V.S.A. § 2103(18)(A) (defining "local election" to mean "any election that deals with the selection of persons to fill public office or the settling of public questions solely within a single municipality"). Also, municipal officers today are still accountable to their local electorate and not "the votes of the freemen of the state at large." Rowell, 58 Vt. at 5, 3 A. at 907. It is fundamentally different to act as a statewide officer compared to a municipal officer in terms of powers and accountability. Therefore, the structure of the Vermont Constitution and the Constitution's treatment of municipalities in the scheme of statewide governance indicate that Chapter II's requirements for statewide elections and representatives, including those in § 42, do not apply to municipal elections and officers.

¶ 47. Plaintiffs are correct that some of the distinctions between statewide and local elections that were present at the time Marsh and Woodcock were decided no longer exist; however, this does not undermine the conclusion that the Constitution treats voter qualifications for statewide elections differently from municipal elections under § 42. When Woodcock was

24

decided, a man had to be a local resident for a period of time and a taxpayer in order to vote in municipal elections, but a freeman—a voter in statewide elections—did not have to be a taxpayer. Woodcock, 35 Vt. at 638. Stated succinctly, "the right to vote" in local elections was "grounded in the liability to pay taxes." Park, 50 Vt. at 200 (emphasis omitted). Voters in local elections no longer need to be men, own property, or pay poll taxes. See 17 V.S.A. §§ 2121, 2656. However, the fact that the Legislature has changed the qualifications for municipal voters over time but the Constitution's requirements for statewide voters has consistently included citizenship since 1828 does not mean that the Constitution restrains the Legislature from creating inconsistent qualifications for municipal voters. See State Treasurer v. Cross, 9 Vt. 289, 293 (1837) ("The doings of the legislature, when not liable to constitutional objections, are to be respected by the other branches of government, and their wisdom or propriety are not to be questioned by a co-ordinate branch."). The Legislature is aware of these changes in municipal-voter qualifications over time and of our precedents differentiating between statewide and municipal elections and of its own volition has chosen not to alter citizenship requirements for municipal elections until now. The policy decision to align municipal and statewide voter qualifications does not change the distinction between the two types of voters that the framers drafted into the Constitution.[7]

---

[7] We disagree with plaintiffs' characterization that it is "well-accepted and widely acknowledged" that § 42 applies to local elections based on opinions expressed in a few 2010s legal memoranda assessing whether noncitizen voting in municipal elections would be constitutional for the benefit of policymakers. See Okemo Mountain, Inc. v. Town of Ludlow, 171 Vt. 201, 206, 762 A.2d 1219, 1224 (2000) (stating that attorney-general opinions provided for benefit of state officers are advisory).

Plaintiffs also insinuate that concluding § 42 does not apply to municipal elections would be contrary to the guarantee of universal suffrage in Vermont. We disagree. Nothing in this opinion permits the Legislature to violate Vermonters' constitutional rights provided in Chapter I, such as those in the Common Benefits Clause, Vt. Const. ch. I, § 7, when determining the qualifications for municipal voters. To equate allowing noncitizens to vote in local elections with excluding women from voting in any election on the basis of sex relies on the false premise that § 42 exists and operates in isolation of the rest of the Constitution. It also ignores distinctions drawn between Chapter I and Chapter II in the precedents discussed.

¶ 48.    Moreover, we do not agree with plaintiffs that some extra-municipal impact, no matter how tenuous, constitutes a statewide issue subject to the requirements in § 42.  The "purely local" distinction plaintiffs ask us to draw is untenable and not grounded in history.  At the time Woodcock was decided, a town constable acted as the presiding and certifying officer of freemen's meetings.  35 Vt. at 639.  The Court stated that "there is nothing legally incompatible" with a nonfreeman acting as an officer in freemen's meetings.  Id. at 640.  A connection between municipal and state governance existed in Rowell, when the Court decided "officer" in the Constitution meant state officers not town officers, as well.  58 Vt. at 7, 3 A. at 908 (explaining that local officers' role in enforcing statewide objectives did not in itself make them state officers).  We need not address the constitutionality of every theoretical issue or office subject to "municipal" vote in this case.  This is a facial challenge, and pointing to some examples where a statute "might operate unconstitutionally . . . is insufficient to render it wholly invalid."  Salerno, 481 U.S. at 745.  We are simply not convinced that there are no more "local" elections as contemplated in the Vermont Constitution when § 42 was first drafted.

¶ 49.    What this outline of municipal government and the power it wields highlights is that even considering changes in local elections' extra-municipal impacts over time, we do not agree with plaintiffs that all municipal affairs today are essentially "freemen's" affairs.  There is still a difference between municipal government and state government.  Maintaining our precedents' distinction between local and statewide elections for purposes of § 42 is therefore "faithful" to the framers' intent and accounts for changes "the framers undoubtedly could never have imagined."  Baker, 170 Vt. at 207, 744 A.2d at 874.

¶ 50.    Because plaintiffs bring a facial challenge, we need not define the line between "local" or "municipal" and "statewide" issues in this opinion.  For this reason, we disagree with plaintiffs' assertion that our conclusion in this case precludes judicial review of municipal elections.  A vote municipal in name, but traditionally the province of "freemen" in substance,

could not avoid the requirements of § 42. See Slayton, 108 Vt. at 290-91, 187 A. at 384 (explaining that in Martin we held that freeman could not be denied right to vote on issue "in essence and effect a vote by the freemen of the state" though vote was taken by towns); see also Martin, 90 Vt. at 170, 97 A. at 444 (observing as dicta that denying freeman right to vote on statewide referenda for failure to meet municipal voter qualifications could raise constitutional issues). It is a different legal question to determine whether a specific vote is properly municipal or statewide—and one not presented in this case.

¶ 51. The frame of government our Constitution creates is essential to the outcome of this case and imbues our judicial review here. As the final arbiters of the Vermont Constitution, to declare an act of the Legislature unconstitutional is the "gravest and most delicate duty that this Court is called on to perform." Blodgett v. Holden, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring). It is accordingly "crucial . . . to keep in mind" that our judicial role is to determine whether the statute "passes constitutional muster," in other words to check whether it is a permissible exercise of legislative power. Peck v. Douglas, 148 Vt. 128, 132-33, 530 A.2d 551, 554 (1987); see also Park, 50 Vt. at 191 (explaining that under our political system creating separation of powers, Legislature has all legislative power "except so far as it is withheld by the Constitution itself"). This framework is also why, in consideration of questions "involving the action of a co-ordinate branch of the Government, we are not to be guided by any views of our own as to the expediency or wisdom of the action under review, but are compelled to follow wheresoever well-settled rules of construction may lead us." Park, 50 Vt. at 190. Within this system of checks and balances that informs our judicial review, statutes are presumed constitutional, and proponents of a facial challenge carry a "very weighty burden" to achieve that statute's invalidation. Badgley, 2010 VT 68, ¶ 20.

¶ 52. When we review our precedents and carefully employ settled principles of constitutional construction, we come to the conclusion that § 42 of the Vermont Constitution does

not apply to municipal elections.  Because § 42 does not constrain the Legislature from acting as it has, the charter amendment constitutes a policy determination whose propriety we do not review.  Plaintiffs' constitutional claim was accordingly correctly dismissed by the trial court.

### III.  Conclusion

¶ 53.    Plaintiffs alleged facts sufficient to establish standing for their facial challenge to the Montpelier charter amendment at the pleadings stage because they alleged that the law on its face changes the qualifications for voters as defined in § 42, and that some of them are voters within the voter pool for which those qualifications have been changed.  However, their claim was properly dismissed on the merits because our precedents demonstrate that § 42 does not apply to municipal elections and we decline to overrule or abrogate those precedents in this case.

Affirmed.

FOR THE COURT:

_____
Associate Justice

28