Filed 09/01/23

| | | |
|---|---|---|
| VERMONT SUPERIOR COURT<br>Washington Unit<br>65 State Street<br>Montpelier VT 05602<br>802-828-2091<br>www.vermontjudiciary.org |  | CIVIL DIVISION<br>Case No. 22-CV-04195 |

Standing Trees Inc. et al v. State of Vermont

## Ruling on the State's Motion to Dismiss

In this case, Plaintiffs Jamison Ervin, Alan Pierce, and Standing Trees Inc., an environmental advocacy organization to which they belong, have brought several claims against the State arising out of their interactions with the Department of Forests, Parks, and Recreation (FPR) and the Department of Fish & Wildlife (F&W) [collectively, the Departments].[1] Plaintiffs seek declaratory and injunctive relief, including a statewide ban on all logging of State lands until certain "policies" of the Departments are subjected to formal rulemaking proceedings under Vermont's Administrative Procedures Act, 3 V.S.A. §§ 831–848. The State seeks dismissal for lack of subject matter jurisdiction and, in the alternative, failure to state a claim.

Plaintiffs represent that their several public records requests caused the Departments to produce three of their "policies" as follows: (1) Long Range Management Planning (LRMP) Process and Plan Format, of which 4.0 Land Management Classification (updated August 2004) is a part; (2) FPR Policy #21; and (3) Use of State Land (2008). According to Plaintiffs, these policies address the Departments' involvement in approving timber harvests on state land and use of state forests and

---

[1] Plaintiffs have named the respective commissioners as defendants in this case, but they are so named in official capacity only. Thus, the only true defendant in interest is the State of Vermont.

parks and, as far as they go, do not expressly require consideration of global warming or flood resiliency. Although Plaintiffs do not allege that the Departments entirely disregard those issues when making such decisions, they plainly think that these three policies should require consideration of those matters expressly.

In Count 1, Plaintiffs request (a) declarations that the policies violate 10 V.S.A. § 2603 because none has been adopted as a rule and (b) injunctive relief compelling FPR to begin rulemaking proceedings to so adopt them. Section 2603(c)(1) provides: "The Commissioner [of FPR], subject to the direction and approval of the Secretary, shall adopt and publish rules in the name of the Agency for the use of State forests, or park lands, including reasonable fees or charges for the use of the lands, roads, camping sites, buildings, and other facilities and for the harvesting of timber or removal of minerals or other resources from such lands, notwithstanding 32 V.S.A. § 603."

In Count 2, Plaintiffs ask the Court to declare a violation of 10 V.S.A. § 578 and order the Departments to start complying with § 578 by adopting policies, rules, or in any other way. Section 578(c) provides: "In order to facilitate the State's compliance with the goals established in this section, all State agencies shall consider any increase or decrease in greenhouse gas emissions in their decision-making procedures with respect to the purchase and use of equipment and goods; the siting, construction, and maintenance of buildings; the assignment of personnel; and the planning, design, and operation of programs, services, and infrastructure." There is no allegation that the Departments, in fact, do not do this, only that the identified policies do not literally reflect that they do so.

Count 3 has two parts. First, Plaintiffs ask the Court to compel rulemaking under 3 V.S.A. § 831(c): "An agency shall initiate rulemaking to adopt as a rule an existing practice or procedure when so requested by 25 or more persons or by the Legislative Committee on Administrative Rules. An agency shall not be required to initiate rulemaking with respect to any practice or procedure, except as provided by this subsection." Plaintiffs and at least 22 other persons requested that the Departments initiate rulemaking, and they have not done so.[2]

Plaintiffs expect that, if the Departments initiate rulemaking proceedings, the rules eventually adopted (after public notice and comment and legislative review) may better reflect their positions as to global warming and flood resiliency and, thus, may benefit them in relation to the public lands adjacent to their home and where they visit recreationally. They request that the Court enjoin all timber harvests on public land statewide until these rulemakings occur. They do not seek an order compelling rulemaking under 10 V.S.A. § 578(c), which requires "consideration" rather than the adoption of rules or policies, but one presumes that they believe that if the Departments' policies more expressly reflect the purport of § 578, those policies may benefit them.

In the second part of Count 3, Plaintiffs seek an order compelling the Departments to post the identified policies on their websites pursuant to 3 V.S.A. § 835(a), which provides:

> Procedures and guidance documents shall be maintained by the agency in an official current compilation that includes an index. Each addition, change, or deletion to the official compilation shall also be dated, indexed, and recorded. The agency shall publish the compilation and index on its

---

[2] The State maintains that the nature of the letter request submitted by Plaintiffs does not fall within the contemplation of § 831(c). It is unnecessary to address this argument at this time, and the Court declines to do so.

Internet website and make all procedures and guidance documents available to the public. On or after January 1, 2024, an agency shall not rely on a procedure or guidance document or cite it against any party to a proceeding, unless the procedure or guidance document is included in a compilation maintained and published in accordance with this subsection.

The publication and deadline component of this provision was adopted in 2018. Plaintiffs allege that the Departments have not posted the three policies at issue here on their websites. Obviously, the deadline for posting has not yet come to pass.

The State seeks dismissal. Its principal argument is that Plaintiffs lack constitutional standing to bring these claims in court. As standing is a component of the Court's subject matter jurisdiction, the Court addresses this argument first. *See Ihinger v. Ihinger*, 2003 VT 38, ¶ 5, 175 Vt. 520, 521 (mem.) ("Because standing is a jurisdictional issue, we must first determine the merits of [this] threshold argument."). The Court notes that none of the statutes under which Plaintiffs seek relief provides any private right of action. Instead, Plaintiffs seek to enforce those laws through Vt. R. Civ. P. 75 by seeking relief in the nature of the common-law writ of mandamus. Whether a suitable party could have a *cause of action* for mandamus under these statutes is less than clear. Standing, however, is a separate matter that must be satisfied at all events. *See* 13A Charles Wright, Arthur Miller & Mary Kane, *Fed. Prac. & Proc. Juris.* § 3531 (3d ed.) [hereinafter "Wright & Miller"] ("The question whether the law recognizes the cause of action stated by a plaintiff is frequently transformed into inappropriate standing terms. The Supreme Court has stated succinctly that the cause-of-action question is not a question of standing.").

## I.    Procedural Standard

A motion seeking dismissal for lack of standing is considered under Rule 12(b)(1), which addresses subject matter jurisdiction.  *See* 5B Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1350.  As the Vermont Supreme Court has described, when considering a motion to dismiss for lack of subject matter jurisdiction, "'all uncontroverted factual allegations of the complaint [are] accepted as true and construed in the light most favorable to the nonmoving party.'  'A court may consider evidence outside the pleadings.'"  *Mullinnex v. Menard*, 2020 VT 33, ¶ 8, 212 Vt. 432 (citations omitted); *see Conley v. Crisafulli*, 2010 VT 38, ¶ 3, 188 Vt. 11, 14 (court may accept evidence from outside the record to resolve dispute as to jurisdiction).

## II.    Standing Generally

"Standing doctrine is fundamentally rooted in respect for the separation of powers of the independent branches of government."  *Hinesburg Sand & Gravel Co. v. State*, 166 Vt. 337, 341 (1997) (noting at 340–41 that "[o]ne of the 'passive virtues' of the standing doctrine is to promote judicial restraint by limiting the occasions for judicial intervention into the political process").  Standing "confin[es] the judiciary to the adjudication of actual disputes and prevent[s] the judiciary from presiding over broad-based policy questions that are properly resolved in the legislative arena."  *Parker v. Town of Milton*, 169 Vt. 74, 77 (1998).

The contemporary federal doctrine was described in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), as follows:

> [T]he irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or

'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560–61 (citations omitted). These are the constitutional (as opposed to prudential) limits on federal courts' jurisdiction.

Among other interests served, the requirement that the plaintiff be someone who has suffered an actual injury "ensure[s] that the plaintiff has a sufficient personal stake in the outcome of the controversy to ensure vigorous presentation of the issues." *Apter v. Richardson*, 510 F.2d 351, 353 (7th Cir. 1975); *see* 13A Wright & Miller, Fed. Prac. & Proc. Juris. § 3531(standing doctrine requires a "'personal stake' that will make the plaintiff an effective litigant").

The federal standing requirements have been adopted in Vermont. *Parker*, 169 Vt. at 77–78 (explaining that in *Hinesburg Sand & Gravel*, the Vermont Supreme Court adopted the standing test articulated in *Lujan*). Vermont courts are not, however, inflexibly bound by federal standing precedents insofar as standing in our courts presents a legal question under the Vermont, rather than United States, constitution.[3] *See Ferry v. City of Montpelier*, 2023 VT 4, ¶ 15 (2023). "A plaintiff must allege facts sufficient to establish his or her standing '[o]n the face of the complaint.'" *Paige v. State*, 2018 VT 136, ¶ 10, 209 Vt. 379, 384 (citation omitted).

---

[3] The parties surely disagree about the implications of federal standing case law in this case, but both apply it and neither attempts to argue that the Court should disregard it and strike out in some new state-specific direction. The Court sees no manifest reason to depart from the federal cases here and, accordingly, applies that law for Vermont constitutional purposes.

III.    Standing as to Count 1, 10 V.S.A. § 2603

The parties disagree as to whether 2603(c)(1), which speaks to FPR rulemaking, required FPR to adopt the policies at issue in this case as rules. Plaintiffs take the position that it did. To properly raise that issue here, they first must allege facts showing that they have standing. The State argues that they lack a cognizable injury. Plaintiffs argue that they are asserting a "procedural violation" (lack of required rulemaking) and that, under a line of U.S. Supreme Court cases, standing requirements are relaxed in the context of procedural violations. Under the relaxed standard, they argue, they have standing. The State disputes that this is a procedural violation case.

In the Court's view, it is unnecessary to resolve that contest. The procedural violation cases may relax redressability and immediacy requirements, but they do not relax the bedrock *injury* requirement. Plaintiffs may not rely upon such case law in an attempt to bypass their obligation to allege facts showing a constitutional injury. A review of the complaint shows that they have failed to allege an injury that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

In the complaint, Plaintiffs focus on a feared timber harvest in the Camel's Hump area that could affect their interests if it materializes. Potentially relevant allegations include the following:

24. Dr. Ervin and Dr. Pierce reside on Mountainview Road in Duxbury, Vermont.

25. Their property adjoins, is downhill and downstream of, and enjoys views of Camel's Hump State Park.

26. Dr. Ervin and Dr. Pierce frequently walk, hike and study the forests that surround their home, including the forests in nearby State Forests, Parks and Wildlife Management Areas.

27. Their walking in, hiking in and study of the forests in nearby State Forests, Parks and Wildlife Management Areas is far more frequent, far more informed by years of study of forests, and far more important to the quality of their daily lives than use of State Forests, Parks or Wildlife Management Areas is for the vast majority of Vermont residents.

28. Every spring for the past 15 years, Dr. Pierce has visited a high rich mesic cove in the nearby State Forests and Parks. The cove is filled with mature maple and ash trees and carpeted with spring ephemeral flowers. This cove has a beautiful view to the north and reliably produces morel mushrooms every year, which Dr. Pierce harvests for personal consumption. The cove may be harvested according to the Defendants' current timber harvest schedule. Dr. Pierce will experience an acute sense of loss if this area is logged because it will not recover in his lifetime.

. . .

33. Dr. Ervin and Dr. Pierce will suffer irreparable harm from the harvesting of the forests enjoyed by Dr. Ervin and Dr. Pierce, including but not limited to forests with mature trees, and from the loss of habitat for endangered and threatened species and species specific to interior, mature forests, with the resulting losses of these species.

. . .

37. The Defendants' current plans are to authorize logging on public lands uphill and upstream of the lands owned by Dr. Ervin and Dr. Pierce and uphill and upstream of the roads and bridges they use. Some of these lands fall within the categories of the lands upon which Enhancing Flood Resiliency of Vermont State Lands recommended OCP's be adopted. The Defendants do not plan to adopt OCP's that the report recommended for some of these lands.

38. Harvesting of trees, and construction of logging roads and log landings, in the areas planned by the Defendants will cause Dr. Ervin and Dr. Pierce to suffer irreparable harm because the flooding of streams and rivers will expose them to greater risk of personal injury and property damage.

. . .

40. The Defendants plan future harvesting of trees in areas that log-carrying trucks will access by means of the same roads and bridges that Dr.

Ervin and Dr. Pierce rely upon for access to their home, essential services, and to lands they walk, hike and study.

. . .

46. Defendants manage State Forests, Parks and Wildlife Management Areas based upon unit management plans.

47. Unit management plans do not constitute final decisions to harvest timber in a particular State Forest, Park or Wildlife Management Area.

48. Management plans schedule timber harvests five, ten or fifteen years into the future.

49. Prior to authorizing advertising for bids to harvest timber in any State Forest, Park or Wildlife Management Area, Defendants make a final decision about each proposed harvest. These decisions consider information obtained after completion of the management plan, such as recent information on forest health and endangered species habitat.

. . .

58. On November 24, 2021, the Secretary of the Agency of Natural Resources approved of the final version of the Camel's Hump Unit Management Plan.

59. This management plan contemplates timber harvests at 34 different sites.

60. The management plan states that before any of the 34 timber harvests will be authorized, Defendants will engage in a "robust process" of evaluation, including consideration of data pertaining to forest health, species composition, soil characteristics, wildlife habitat and the presence of rare, threatened and endangered species.

61. The 34 harvests contemplated in that plan have "target" dates for each harvest that start in 2022 and end in 2036.

. . .

87. Defendants also stated that they would not refrain from authorizing timber harvests listed in the Camel's Hump Unit Management Plan.

. . .

97.  Commissioner Snyder has acted in an arbitrary and capricious and unlawful manner by stating that he will, in the future, authorize actual timber harvesting in the Camel's Hump Management Unit based on written procedures none of which was adopted and published as a rule.

.   .   .

107.  Plaintiffs will suffer irreparable harm when timber harvesting occurs on the lands of Vermont State Forests and Parks Forests and Wildlife Management Areas that are used and relied upon by Plaintiffs without having been evaluated in a manner that included consideration of greenhouse gas emissions.

The allegations of the complaint are plain: in the future, the Departments, after a "robust" review process, *could* approve a harvest in the Camel's Hump area.  Whether any such harvest may be approved, and whether the robust review process would lack the considerations about which Plaintiffs are concerned, are left entirely to speculation.

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009), puts the injury defect in this case in stark relief.  In that case, certain environmental organizations collectively known as Earth Island, wished to participate in notice and comment procedures for projects that the United States Forest Service had deemed exempt from such procedures.  At the time Earth Island filed suit, one project, "Burnt Ridge," threatened an injury for standing purposes.  The controversy as to Burnt Ridge then settled.  Earth Island nevertheless sought to persist with the lawsuit as to other projects for which they could not identify any concrete injury.  As the Summers Court explained, for lack of that harm, they no longer had standing.

*Summers'* discussion of general standing principles as applied in a somewhat similar setting to the instant action makes its rationale worth quoting at length.

> In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts it to the traditional role of Anglo–American courts, which is to redress or prevent actual or imminently threatened

injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action. This limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society."

The doctrine of standing is one of several doctrines that reflect this fundamental limitation. It requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." He bears the burden of showing that he has standing for each type of relief sought. To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. This requirement assures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." Where that need does not exist, allowing courts to oversee legislative or executive action "would significantly alter the allocation of power . . . away from a democratic form of government."

The regulations under challenge here neither require nor forbid any action on the part of respondents. The standards and procedures that they prescribe for Forest Service appeals govern only the conduct of Forest Service officials engaged in project planning. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Here, respondents can demonstrate standing only if application of the regulations by the Government will affect them in the manner described above.

It is common ground that the respondent organizations can assert the standing of their members. To establish the concrete and particularized injury that standing requires, respondents point to their members' recreational interests in the national forests. While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.

Affidavits submitted to the District Court alleged that organization member Ara Marderosian had repeatedly visited the Burnt Ridge site, that he had imminent plans to do so again, and that his interests in viewing the flora and fauna of the area would be harmed if the Burnt Ridge Project went forward without incorporation of the ideas he would have suggested if the Forest Service had provided him an opportunity to comment. The

Government concedes this was sufficient to establish Article III standing with respect to Burnt Ridge. Marderosian's threatened injury with regard to that project was originally one of the bases for the present suit. After the District Court had issued a preliminary injunction, however, the parties settled their differences on that score. Marderosian's injury in fact with regard to that project has been remedied, and it is, as the District Court pronounced, "not at issue in this case." We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests. Such a holding would fly in the face of Article III's injury-in-fact requirement.

Respondents have identified no other application of the invalidated regulations that threatens imminent and concrete harm to the interests of their members. The only other affidavit relied on was that of Jim Bensman. He asserted, first, that he had suffered injury in the past from development on Forest Service land. That does not suffice for several reasons: because it was not tied to application of the challenged regulations, because it does not identify any particular site, and because it relates to past injury rather than imminent future injury that is sought to be enjoined.

.   .   .

Respondents argue that they have standing to bring their challenge because they have suffered procedural injury, namely, that they have been denied the ability to file comments on some Forest Service actions and will continue to be so denied. But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing. Only a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Respondents alleged such injury in their challenge to the Burnt Ridge Project, claiming that but for the allegedly unlawful abridged procedures they would have been able to oppose the project that threatened to impinge on their concrete plans to observe nature in that specific area. But Burnt Ridge is now off the table.

It makes no difference that the procedural right has been accorded by Congress. That can loosen the strictures of the redressability prong of our standing inquiry—so that standing existed with regard to the Burnt Ridge Project, for example, despite the possibility that Earth Island's allegedly guaranteed right to comment would not be successful in persuading the Forest Service to avoid impairment of Earth Island's concrete interests.

> Unlike redressability, however, the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute.

> > "[I]t would exceed [Article III's] limitations if, at the behest of Congress and in the absence of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws. . . [T]he party bringing suit must show that the action injures him in a concrete and personal way."

*Summers v. Earth Island Institute*, 555 U.S. 488, 492–97 (2009) (citations omitted).

Plaintiffs in this case have alleged, at best, only a procedural right *in vacuo*: that if some future project is approved, then it might have some effect on their interests. There is no project pending in Vermont akin to the abandoned Burnt Ridge project discussed in *Summers* that might potentially be a basis to claim an imminent and concrete harm. In other words, like the plaintiffs in *Summers*, they only speculate about some possible, future injury. As the High Court says, however, even in the procedural violation context, "the requirement of injury in fact is a hard floor" of standing doctrine. *Id.* Plaintiffs have alleged no injury and, therefore, have no standing to invoke judicial power to resolve the controversy. *See generally* 13B Wright & Miller, *Fed. Prac. & Proc. Juris.* § 3531.10 ("Standing doctrines reflect in many ways the rule that neither citizens nor taxpayers can appear in court simply to insist that the government and its officials adhere to the requirements of law.").

IV.     Standing as to Count 2, 10 V.S.A. § 578

Plaintiffs fare no better under 10 V.S.A. § 578. Section 578(c) requires agencies to "consider any increase or decrease in greenhouse gas emissions in their decision-making procedures with respect to" certain decisions. It does not purport to require the adoption of any rules or policies. In any event, for all the reasons Plaintiffs have failed to allege facts showing standing under Count 1, they similarly have failed to do so under Count 2.

V.      Standing as to Count 3, 10 V.S.A. § 831(c)

The same is true as to 10 V.S.A. § 831(c). This law provides that "An agency shall initiate rulemaking to adopt as a rule an existing practice or procedure when so requested by 25 or more persons." Plaintiffs essentially argue under this Count that because the legislature has authorized 25 persons to request that an agency undertake rulemaking to adopt an existing policy, and they have so requested, that they thereby necessarily have standing to enforce that request in Court regardless of ordinary standing principles. This is simply not so.

Standing addresses the right to bring an action in court. One must always have standing to sue. The same requirement does not apply to requests for relief from administrative agencies. *See* 13B Wright & Miller, *Fed. Prac. & Proc. Juris.* § 3531.13 ("Administrative agencies . . . should not be bound by judicial rules of standing in determining what parties to admit to adjudicatory or rulemaking proceedings, any more than they are bound by other judicial rules of procedure. So it has been recognized that an agency may accord standing without satisfying Article III requirements.").

When there is a statutory right to sue, the Court will interpret that statute as broadly as the principles of statutory interpretation appropriately suggest -- up to, but not exceeding -- the boundaries of standing requirements. *See generally, Capitol Plaza 2-Lot Subdivision Capitol Plaza Major Site Plan*, 3-1-19 Vtec, 2019 WL 7900450 (Vt. Super. Ct. Nov. 12, 2019) (Walsh, J.) (addressing this issue in land use context).

The Legislature also may seek to "augment" standing by creating a right to sue that would not otherwise exist under traditional standing principles. *See generally* 13B Wright & Miller, *Fed. Prac. & Proc. Juris.* § 3531.13 (legislative augmentation). To do

this, it creates a new legal right by statute and then confers a right to sue for its breach or deprivation.

In recent cases, the U.S. Supreme Court has made clear, however, that the ability to augment standing legislatively is limited and still must satisfy the injury requirement. *See TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2205 (2021) ("Importantly, this Court has rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" (citation omitted)); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."); *see also Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) ("In no event, however, may Congress abrogate the Art. III minima.").

At the end of the day, then, even when a legislative body purports to establish a right that can be enforced through a court action, the plaintiff must still establish an actual injury to bring a case. As explained by the Supreme Court:

> To appreciate how the Article III "concrete harm" principle operates in practice, consider two different hypothetical plaintiffs. Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine. The violation did not personally harm the plaintiff in Hawaii.

> Even if Congress affords both hypothetical plaintiffs a cause of action (with statutory damages available) to sue over the defendant's legal violation, Article III standing doctrine sharply distinguishes between those

two scenarios. The first lawsuit may of course proceed in federal court because the plaintiff has suffered concrete harm to her property. But the second lawsuit may not proceed because that plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts. An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's "compliance with regulatory law" (and, of course, to obtain some money via the statutory damages). *Spokeo*, 578 U. S., at 345, 136 S.Ct. 1540 (THOMAS, J., concurring) (internal quotation marks omitted); *see Steel Co.*, 523 U.S., at 106–107, 118 S.Ct. 1003. Those are not grounds for Article III standing.

*TransUnion LLC,* 141 S.Ct. at 2205–06.

Here, it is unnecessary to determine whether the Legislature, by virtue of 10 V.S.A. § 831(c), has permissibly or impermissibly attempted to augment anyone's standing to sue. Section 831 merely establishes a right to petition an agency and directs that agency to do something when so petitioned. It does not purport to grant the requesters any right to sue if the agency fails to act. Thus, it cannot represent any effort by the Legislature to expand on traditional standing principles.

Plaintiffs do not appear to contest that view and, instead, locate their purported right to sue in the common-law writ of mandamus under Vt. R. Civ. P. 75. The claim fares no better in that venue. Mandamus actions are not exempt from ordinary standing principles, much less the injury requirement. Plaintiffs in mandamus actions must still establish standing, and the same standards and considerations discussed in *TransUnion* are applicable in such proceedings. *See Wool v. Off. of Pro. Regul.*, 2020 VT 44, ¶¶ 9–12, 212 Vt. 305 (determining whether proponent of mandamus claim had standing); *Wool v. Menard*, 2018 VT 23, ¶¶ 19–21, 207 Vt. 25, 35–36 (same). As noted above, Plaintiffs lack injury sufficient to establish standing to bring this claim. Their reliance on Rule 75 does not alter that equation.

V.    Standing as to Count 3, 3 V.S.A. § 835(a)

Plaintiffs also have no standing to advance their 3 V.S.A. § 835(a) claim.  That statute directs agencies to post their "procedures and guidance documents" on their websites by January 1, 2024.  If they do not, the agencies can neither cite, nor otherwise rely on them.  Plaintiffs represent that the three policies at issue in this case are not posted on the Departments' websites.  They ask the Court to order the Departments to post them.  Section 835 does not authorize any private action to force an agency to post anything.

The lack of any injury to Plaintiffs is manifest.  They already possess the policies they would like the Departments to post online.  The only palpable need for any such posting is to facilitate access.  Plaintiffs need no online access from the Departments to something they already possess.

Standing Trees' independent claim to its own organizational standing as to 3 V.S.A. § 835(a) fares no better.  Standing Trees argues that it had to devote its resources to public records requests to obtain the three policies that, in its view, the Departments should have proactively made available online.  Doing so, it claims, diminished the resources it had available for its advocacy work.  That lost opportunity to advocate, it argues, is its injury for standing purposes.  The State responds that Standing Trees cannot manufacture its own standing in this manner, but it is unnecessary to go down that road.

Whatever injury Standing Trees may believe it suffered for having to make public records requests, it now possesses the policies it sought.  If there was an injury in the past, there is none now.  *See Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009)

("We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests."). Posting the policies online now would redress nothing as to any injury perceived by Standing Trees. It does not need to make more public records requests to obtain what it already has.[4]

### Conclusion

For the foregoing reasons, the State's motion to dismiss is granted. Except as noted above, because Plaintiffs lack standing to sue as to all their claims, it is unnecessary to address the many other reasons the State seeks dismissal.

Electronically signed on September 1, 2023, pursuant to V.R.E.F. 9(d).

Timothy B. Tomasi
Superior Court Judge

---

[4] In any event, the Court also agrees that Plaintiffs have failed to state a claim as to this Count. Section 835(a) does not stand for the proposition that all agencies must immediately post to their websites all existing procedures and guidance documents. Instead, it provides a deadline (which has not yet come to pass) by which agencies must determine which materials to include in their compilation and post publicly if the agency intends to cite or rely on them after the deadline. There is no merit to a claim attempting to force an agency to post materials under § 835(a) prior to the January 2024 deadline.